[843 NE2d 727, 810 NYS2d 100]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANDREW GOLDSTEIN, Appellant.

Argued November 16, 2005; decided December 20, 2005

120

**POINTS OF COUNSEL**

*Legal Aid Society, Criminal Appeals Bureau,* New York City (*Natalie Rea* and *Laura R. Johnson* of counsel), for appellant. I. By allowing the People's expert forensic psychiatrist—Dr. Angela Hegarty—to testify, over objection, about statements made to her by nontestifying witnesses, the court deprived appellant of his right to confrontation and due process (1) under *Crawford v Washington* (541 US 36 [2004]), because the statements made during the course of interviews conducted by an agent of the state for the purpose of prosecution were inadmissible testimonial hearsay and (2) under *People v Stone* (35 NY2d 69 [1974]) and *People v Sugden* (35 NY2d 453 [1974]), because the statements of these witnesses were not of the type generally relied upon by the profession. (*Pointer v Texas,* 380 US 400; *Ohio v Roberts,* 448 US 56; *Rhode Island v Innis,* 446 US 291;

*United States v Saget,* 377 F3d 223; *United States v Cromer,* 389 F3d 662; *People v Coleman,* 16 AD3d 254; *United States v Nielsen,* 371 F3d 574; *People v Rogers,* 8 AD3d 888; *People v Jones,* 73 NY2d 427; *Hambsch v New York City Tr. Auth.,* 63 NY2d 723.) II. Preclusion of the testimony of a defense expert psychiatrist, Dr. Susan Fierster, deprived appellant of his rights to compulsory process, to present a defense and due process because (a) counsel's CPL 250.10 notice was adequate; (b) at the very least, the notice substantially complied with CPL 250.10; and (c) contrary to the findings of the Appellate Division, counsel could not be sanctioned for refusing to turn over Fierster's notes if the notice was adequate. (*Noble v Kelly,* 246 F3d 93; *Washington v Texas,* 388 US 14; *Ronson v Commissioner of Correction of State of N.Y.,* 604 F2d 176; *Taylor v Illinois,* 484 US 400; *Wade v Herbert,* 391 F3d 135; *People v Berk,* 88 NY2d 257; *People v Oakes,* 168 AD2d 893; *People v Almonor,* 93 NY2d 571; *People v Gracius,* 6 AD3d 222; *People v Rivers,* 281 AD2d 348.) III. By rejecting counsel's request to have appellant undergo a PET scan because of its erroneous belief that appellant's schizophrenia was conceded by the People, the court deprived appellant of his right to present a defense. (*People v Wilder,* 93 NY2d 352; *People v Lewis,* 69 NY2d 321; *People v Wesley,* 83 NY2d 417; *Ake v Oklahoma,* 470 US 68; *People v Hills,* 140 AD2d 71; *People v Helms,* 243 App Div 818; *People v Carroll,* 95 NY2d 375; *People v Weinstein,* 156 Misc 2d 34.)

*Robert M. Morgenthau, District Attorney,* New York City (*Morrie I. Kleinbart* and *Patrick J. Hynes* of counsel), for respondent. I. The court properly permitted Dr. Angela Hegarty to testify about extrajudicial statements which served to explain her opinion about defendant's mental state. (*Crawford v Washington,* 541 US 36; *People v Stone,* 35 NY2d 69; *People v Sugden,* 35 NY2d 453; *People v Cronin,* 60 NY2d 430; *People v Jones,* 73 NY2d 427; *People v Romero,* 78 NY2d 355; *Ohio v Roberts,* 448 US 56; *People v Keough,* 276 NY 141; *Howard v Walker,* 406 F3d 114.) II. Justice Berkman's treatment of defendant's belated decision to attempt to pursue an extreme emotional disturbance defense violated no constitutional norm. (*People v Almonor,* 93 NY2d 571; *People v Edney,* 39 NY2d 620; *Washington v Texas,* 388 US 14; *Chambers v Mississippi,* 410 US 284; *Taylor v Illinois,* 484 US 400; *People v Robinson,* 89 NY2d 648; *Rock v Arkansas,* 483 US 44; *People v Williams,* 81 NY2d 303; *People v Berk,* 88 NY2d 257, 519 US 859; *People v Almonor,* 93 NY2d 571.) III. Justice Berkman correctly refused to require the State of New York to fund an unnecessary PET scan. (*Britt v North*

*Carolina,* 404 US 226; *Ake v Oklahoma,* 470 US 68; *Ross v Moffitt,* 417 US 600; *Moore v Kemp,* 809 F2d 702; *People v Gallow,* 171 AD2d 1061; *People v Lane,* 195 AD2d 876; *Johnson v Harris,* 682 F2d 49, 459 US 1041; *People v Koberstein,* 262 AD2d 1032; *People v Oquendo,* 250 AD2d 419; *People v Graves,* 238 AD2d 754.)

### OPINION OF THE COURT

R.S. SMITH, J.

We reverse defendant's conviction and order a new trial, because his constitutional right to be confronted with the witnesses against him was violated when a psychiatrist who testified for the prosecution recounted statements made to her by people who were not available for cross-examination.

## Facts and Procedural History

On January 3, 1999, defendant killed Kendra Webdale, a woman he did not know, by throwing her into the path of an approaching subway train. He was charged with murder in the second degree; his principal defense was insanity. His first trial ended in a hung jury.

At his second trial, the two main witnesses were forensic psychiatrists, Spencer Eth, called by the defense, and Angela Hegarty, called by the prosecution. These doctors agreed that defendant was mentally ill; he had been diagnosed as schizophrenic some 10 years before the act for which he was on trial, and had been treated in a number of mental hospitals in the interim. The doctors disagreed, however, on the role that defendant's mental illness played in the killing.

In Eth's opinion, defendant pushed Kendra Webdale to her death "when he was suffering an acute exacerbation . . . of severe psychotic symptoms," perhaps resulting from a failure to take prescribed antipsychotic medications. Eth testified that the symptoms were so extreme that defendant "couldn't plan, he couldn't intend, he couldn't know as we understand what know means what he was doing or that it was wrong." Hegarty, by contrast, found that defendant had a "relatively mild" disorder "in the schizophrenic spectrum" and that his psychotic symptoms "were substantially in remission" at the time of the killing. Hegarty also testified that defendant's personality had "antisocial" features that were more relevant to his act than his schizophrenia. She testified, in substance, that defendant was a predator, driven to acts of violence against women by feel-

ings of rejection and sexual frustration, who was using his schizophrenia as an excuse for his actions. Both doctors supported their opinions by describing their own examinations of defendant and by reviewing voluminous clinical records.

The main issue on this appeal arises because Hegarty's testimony also described another category of information—facts she had obtained in interviews of third parties. According to Hegarty, her field of expertise, "forensic psychiatry," could be distinguished from more traditional "clinical psychiatry," which "would largely . . . confine itself to what the defendant would say. And maybe the clinical record." The purpose of forensic psychiatry, Hegarty testified, is "to get to the truth," and she made clear that she believes interviews of people with firsthand knowledge are an important way of accomplishing that goal.

Over objection, Hegarty was permitted to tell the jury what she was told by six of her interviewees. The statements thus relayed from four of these people—whom we will call John P., Kimberly D., Serita G. and Isaac V.—are important to our decision.

John P. was a security guard at Waldbaum's in late 1996, about two years before the fatal attack on Kendra Webdale, when defendant assaulted a woman who was shopping there. John P. restrained defendant immediately after the assault, and he described to Hegarty, who repeated to the jury, defendant's reaction when he was seized. According to Hegarty's account of John P.'s statement, defendant said "I'm sick, I'm sick, I'm schizophrenic," kept repeating those assertions, and said that he had just got out of the hospital. Defendant made a similar statement—"I'm psychotic, take me to the hospital," or words to that effect—immediately after throwing Kendra Webdale to her death. John P.'s statement thus supported Hegarty's and the prosecution's theory that defendant had repeatedly used his schizophrenia to minimize his misconduct and avoid punishment.

Kimberly D. was the girlfriend of a man who shared an apartment with defendant in November 1998—about two months before Kendra Webdale's death—when Stephanie H., the girlfriend of another resident, visited the apartment. Hegarty testified that Kimberly D. had told Hegarty that Stephanie H., who worked in a strip club, "would tease" defendant. Hegarty also testified, apparently still recounting what Kimberly D. said to her, that Stephanie H. "bears a rather remarkable similarity

[in] appearance to Kendra Webdale." Thus, Hegarty suggested to the jury that defendant identified the woman he killed with another woman who had frustrated him sexually.

Serita G. had been defendant's landlady twice, first in 1996 and then in 1998-1999 up to the date of Kendra Webdale's death. According to Hegarty, Serita G. told her "that on one occasion . . . her maid went downstairs and the defendant was lying on his bed exposed and he didn't cover himself." This was part of the basis for Hegarty's testimony that defendant had "been sexually inappropriate with women."

Isaac V. was one of defendant's roommates in the month preceding Kendra Webdale's death. Hegarty testified to Isaac V.'s description of defendant's personality: She said that Isaac V. said that defendant was "a little weird . . . didn't act his age . . . wanted to go to college and . . . wanted to be somebody . . . was never disrespectful and never violent and very calm." This description corroborated Hegarty's overall picture of defendant as someone suffering from a relatively mild mental illness, not a hopelessly out-of-control schizophrenic.

The jury convicted defendant of second degree murder, thus rejecting his insanity defense. The Appellate Division affirmed. We now reverse.

## Discussion

Defendant argues that Hegarty's testimony recounting statements of interviewees was inadmissible hearsay under New York law, because the People failed to show that the statements were information of a kind commonly relied on by members of Hegarty's profession. Defendant also argues that the admission of the interviewees' statements violated his constitutional right to confront the witnesses against him. We reject defendant's New York law argument, but we agree that his right to confrontation was violated.

## I

*People v Stone* (35 NY2d 69 [1974]) and *People v Sugden* (35 NY2d 453 [1974]) govern the question of when a psychiatrist's opinion may be received in evidence, even though some of the information on which it is based is inadmissible hearsay. As we explained in *Sugden*, a psychiatrist "may rely on material, albeit of out-of-court origin, if it is of a kind accepted in the profession as reliable in forming a professional opinion," or if it "comes from a witness subject to full cross-examination on the trial"

(35 NY2d at 460, 461). The latter ground for admissibility does not apply here; defendant had no opportunity to cross-examine the interviewees whose statements are in issue. Defendant argues that the former ground is inapplicable also, because the prosecution failed to meet its burden of showing that the interviewees' statements were "material . . . of a kind accepted in the profession as reliable."

■ We disagree. The proponent's burden of showing acceptance in the profession may be met through the testimony of a qualified expert, whether or not that expert is the same one who seeks to rely on the out-of-court material. Here, the People's burden was met by Hegarty's testimony. Hegarty acknowledged that "traditionally" psychiatrists did not rely on interviews with third parties, but said that "several researchers, forensic psychiatrists, past presidents of the Academy of Psychiatry and Law, Park Dietz and Philip Resnick, for example" had emphasized the need for a broader approach. While she acknowledged that "not everybody holds this view" and that "many good forensic psychiatrists might . . . disagree," she testified that interviewing of third parties is "becoming more and more the practice." She added that the seeking out of facts from sources other than defendant's own statements and the clinical record is "very, very much supported in the literature."

Any imprecision in Hegarty's description of accepted professional practice could have been explored on cross-examination; defendant's counsel was free to ask Hegarty, for example, exactly what "literature" she was referring to, and to try to show it did not support her procedure. But Hegarty's statements on this issue were neither made the subject of cross-examination nor contradicted by any other evidence. Indeed, Eth acknowledged that Hegarty's preferred approach was accepted by some reputable professionals, though he said they were a "minority." The prosecution did not have to prove that the materials in question were universally accepted; widespread acceptance by professionals of good reputation is enough. The case would be different if the procedures at issue found support only among a faction of outliers not generally respected by their colleagues. But in this case, the trial court had a sufficient basis for finding that the third-party interviews were material of a kind accepted in the profession as reliable, and that therefore Hegarty's opinion was admissible under *Stone* and *Sugden*.

## II

To avoid any misinterpretation of our holding, we point out the existence of a New York law issue that the parties have not addressed and we do not reach.

We have held in section I only that Hegarty's *opinion*, although based in part on statements made out of court, was admissible because those statements met the test of acceptance in the profession. Both parties seem to assume that, if that test was met, Hegarty was free, subject to defendant's constitutional right of confrontation, not only to express her opinion but to repeat to the jury all the hearsay information on which it was based. That is a questionable assumption.

*Stone* and *Sugden* were concerned with the admissibility of a psychiatrist's opinion, not the facts underlying it. There is no indication in either case that the prosecution sought to elicit from the psychiatrist the content of the hearsay statements he relied on. And it can be argued that there should be at least some limit on the right of the proponent of an expert's opinion to put before the factfinder all the information, not otherwise admissible, on which the opinion is based. Otherwise, a party might effectively nullify the hearsay rule by making that party's expert a "conduit for hearsay" (*Hutchinson v Groskin*, 927 F2d 722, 725 [2d Cir 1991]).

The distinction between the admissibility of an expert's opinion and the admissibility of the information underlying it, when offered by the proponent, has received surprisingly little attention in this state (which perhaps accounts for the parties' failure to discuss it here). We have found no New York case addressing the question of when a party offering a psychiatrist's opinion pursuant to *Stone* and *Sugden* may present, through the expert, otherwise inadmissible information on which the expert relied. The issue of when a proponent may present inadmissible facts underlying an admissible opinion has, however, been discussed by courts in other jurisdictions, and in many law review articles (*see* authorities cited in Kaye et al., The New Wigmore: Expert Evidence § 3.7 [2004]). And in 2000, rule 703 of the Federal Rules of Evidence ("Bases of Opinion Testimony by Experts") was amended to deal with this issue. The last sentence of the rule now provides: "Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to

evaluate the expert's opinion substantially outweighs their prejudicial effect." We are not called upon to decide here, and do not decide, whether the New York rule is the same as, or less or more restrictive than, this federal rule.

### III

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Similarly, article I, § 6 of the New York Constitution provides: "In any trial in any court whatever the party accused shall . . . be confronted with the witnesses against him or her." The meaning of the federal Confrontation Clause was recently considered by the United States Supreme Court in *Crawford v Washington* (541 US 36 [2004]), and we conclude that *Crawford* requires reversal of defendant's conviction.

*Crawford*, which overruled *Ohio v Roberts* (448 US 56 [1980]), establishes that the Confrontation Clause generally prohibits the use of "testimonial" hearsay against a defendant in a criminal case, even if the hearsay is reliable, unless the defendant has a chance to cross-examine the out-of-court declarant. The People contend that *Crawford* does not apply here, first, because the statements by Hegarty's interviewees were not hearsay, and secondly, because they were not testimonial. We reject both arguments.

The claim that the interviewees' statements to Hegarty were not hearsay is based on the theory that they were not offered to prove the truth of what the interviewees said. Hearsay is "a statement made out of court . . . offered for the truth of the fact asserted in the statement" (*People v Romero*, 78 NY2d 355, 361 [1991], quoting Richardson, Evidence § 200, at 176 [Prince 10th ed]). The Supreme Court said in *Crawford* that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted" (541 US at 59 n 9). Here, according to the People, the interviewees' statements were not evidence in themselves, but were admitted only to help the jury in evaluating Hegarty's opinion, and thus were not offered to establish their truth.

We find the distinction the People make unconvincing. We do not see how the jury could use the statements of the interviewees to evaluate Hegarty's opinion without accepting as a premise either that the statements were true or that they were false.

Since the prosecution's goal was to buttress Hegarty's opinion, the prosecution obviously wanted and expected the jury to take the statements as true. Hegarty herself said her purpose in obtaining the statements was "to get to the truth." The distinction between a statement offered for its truth and a statement offered to shed light on an expert's opinion is not meaningful in this context. (*See* Kaye et al., The New Wigmore: Expert Evidence § 3.7, at 19 [Supp 2005] ["'(T)he factually implausible, formalist claim that experts' basis testimony is being introduced only to help in the evaluation of the expert's conclusions but not for its truth ought not permit an end-run around a Constitutional prohibition"].) We conclude that the statements of the interviewees at issue here were offered for their truth, and are hearsay.

We also conclude that the statements are testimonial, in the sense that *Crawford* used that term. *Crawford* explained that the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" (541 US at 51.) The Court added: "'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' . . . An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Id.* [citation omitted].) The Court in *Crawford* did not adopt a definition of testimonial hearsay, but it offered some alternative definitions:

> "Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' . . . 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' . . . 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' . . . . These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it." (*Id.* at 51-52 [citations omitted].)

We think the statements made to Hegarty by her interviewees were testimonial. Hegarty was an expert retained to testify for the People. The record does not specifically show that the interviewees knew this, but it would be strange if Hegarty did not tell them; we infer that they knew they were responding to questions from an agent of the State engaged in trial preparation. None of them was making "a casual remark to an acquaintance"; all of them should reasonably have expected their statements "to be used prosecutorially" or to "be available for use at a later trial."

While it is true that the Supreme Court referred, in describing testimonial hearsay, to "formal" statements made to "government officers," we do not think that these words exclude the statements at issue here. Responses to questions asked in interviews that were part of the prosecution's trial preparation are "formal" in much the same sense as "depositions" and other materials that the Supreme Court identified as testimonial. *Crawford* itself shows that the statements need not be under oath and need not be formal in their language; the statement held excludable by the *Crawford* court was unsworn and used colloquial phrasing (*see* 541 US at 38-39). Nor do we think the difference between an expert retained by the State and a "government officer" is of constitutional significance here. The Confrontation Clause would offer too little protection if it could be avoided by assigning the job of interviewing witnesses to an independent contractor rather than an employee.

In short, defendant's rights under the Confrontation Clause were violated when Hegarty was allowed to tell the jury what witnesses defendant had no chance to cross-examine had said to her.

IV

The People argue that, if the admission of the interviewees' statements was error, the error was harmless. We cannot agree.

Since the error was a violation of defendant's constitutional rights, the constitutional test for harmless error applies: The People must show that any error was harmless beyond a reasonable doubt (*Chapman v California*, 386 US 18, 24 [1967]; *People v Crimmins*, 36 NY2d 230, 240-241 [1975]). In deciding whether the People have met this burden, we consider both the overall strength of the case against defendant and the importance to that case of the improperly admitted evidence.

The People's case that defendant was sane when he killed Kendra Webdale was a strong one, but we cannot say it was so strong that no rational jury could have rejected it. The question before the jury was, in essence, what was going on in defendant's admittedly diseased mind at the time he committed a bizarre, horrifying act; this is not an easy question to answer with complete certainty. In other contexts—for example, when the question is whether a defendant committed a particular act or not—overwhelming evidence will sometimes permit a court to say that only one verdict was reasonably possible. This case is not of that kind.

The People's case drew some significant support from the improperly admitted statements of John P., Kimberly D., Serita G. and Isaac V. It is true that these statements were by no means vital to the People's case on sanity, but they were not trivial either. It is reasonably possible that any of the four—and, a fortiori, all four together—could have affected the jury's verdict. Specifically:

1. John P.'s statement to the effect that defendant, upon being seized after the Waldbaum's incident, said repeatedly "I'm sick, I'm sick, I'm schizophrenic" supported an important theme of the prosecution's case—that defendant thought his schizophrenia was an excuse for his bad behavior. The resemblance of the remarks described in John P.'s statement to those made by defendant after killing Kendra Webdale—"I'm psychotic, take me to the hospital"—strongly suggests a pattern. The prosecution's claim that these protestations showed defendant was hiding behind his mental illness was a major theme in closing argument. Indeed, the prosecutor's last words to the jury were: "He's counting on you to buy, I am sick, take me to a hospital."

It is true that the prosecutor did not rest this argument entirely on John P.'s statement; the prosecutor relied primarily, of course, on the statement defendant made after the Kendra Webdale killing, and also on other more or less similar remarks he made after other incidents. There is a real possibility, however, that without John P.'s statement the argument would not have been as strong. There is no clearer proof in the record that defendant had, before his attack on Kendra Webdale, made a habit of announcing his mental illness the moment he got in trouble.

2. Kimberly D.'s statement that there was a "remarkable" resemblance between Stephanie H., a young woman who

"tease[d]" defendant, and Kendra Webdale could well have had an impact on the jury. It offers a possible explanation for defendant's otherwise inexplicable decision to attack a total stranger on a subway platform, and suggests that, however distorted his reasoning, he acted out of rage, knew he was killing someone, and thus was not legally insane. It is true, as the People point out, that Stephanie H.'s teasing of defendant was proved by other evidence, and that photographs of both Stephanie H. and Kendra Webdale were in evidence, so that perhaps Hegarty could have made her point without relying on Kimberly D.; but Hegarty did not do so, and we cannot be sure she would have done so successfully. From the photographs alone, the jury might or might not have found the resemblance between the two women to be striking.

3. Serita G.'s statement that defendant, lying exposed on his bed, failed to cover himself when a woman came into his presence was used by Hegarty as one example of inappropriate behavior that reflected defendant's sexual frustration. It was not Hegarty's only example, but it was a vivid and memorable one; we cannot say, beyond a reasonable doubt, that it had no effect on the jury.

4. Isaac V.'s sketch of defendant's personality ("a little weird") was useful to the prosecution because it supported Hegarty's overall portrayal of defendant as someone with a "relatively mild" mental disorder, not a raving psychotic. Again, it is true that Hegarty could have made the same point without relying on Isaac V.'s statement, but it is also true that the statement might have had significant impact. It is reasonably possible that jurors found the observations of someone who saw defendant frequently at the very time of the Kendra Webdale killing to be telling evidence of defendant's mental state.

In sum, the People have failed to show beyond a reasonable doubt that the mistaken admission of these four out-of-court statements was harmless error.

## V

Defendant makes two other arguments on this appeal: He contends that the trial court erred in precluding the testimony of a defense expert proffered to support a defense of extreme emotional disturbance, and in refusing to order a PET scan of defendant. To avoid unnecessary issues at a retrial, we mention that we find both arguments lacking in merit. On the facts of this case, the trial court's rulings on both issues were within its discretion.

## VI

We have concluded that another trial of this case is necessary. We are well aware of the unwelcome consequences of this result. Defendant has already been tried twice, and the second jury found, on sufficient evidence, that he was legally sane at the time of his act. We are troubled by the tangible cost of a third trial, and by the intangible cost of the long delay in resolving this case. We are yet more troubled by the knowledge that another trial will bring added pain to innocent people, particularly to the family of Kendra Webdale.

But the constitutional rules that guarantee defendants a fair trial must be enforced, and few such rules are more important than the one that guarantees defendants the right to confront the witnesses against them. Because that right was violated in this case, defendant is entitled to be tried again.

Accordingly, the order of the Appellate Division should be reversed and the case remitted to Supreme Court for a new trial.

READ, J. (dissenting). *Crawford v Washington* (541 US 36 [2004]) is a fresh precedent, the contours and limits of which are still indistinct. At this early stage, it is difficult to predict whether the Supreme Court will apply *Crawford*—universally or in some cases or with limitations or at all—to hearsay used as a basis for expert testimony, much less the exact implications of any such holding. Still, the majority's analysis of this case in relation to *Crawford* is reasonable, and I do not disagree with it. Further, I wholeheartedly agree with section II of the majority opinion, which points out a New York law issue that is, in my view, significant, but which we need not reach here. I respectfully dissent, however, because, even assuming that *Crawford* precludes admission of the four remarks made by interviewees to the People's expert, I cannot agree that defendant suffered any harm as a result.

As an initial matter, we should keep in mind that this trial presented no issue regarding guilt per se. Defendant indisputably killed Kendra Webdale by thrusting her into the path of an oncoming subway train. The only issue at trial was whether defendant had established, by a preponderance of the evidence, his affirmative defense that he should not be held criminally responsible for his conduct because he suffered from a mental disease or defect at the time of the killing (*see* Penal Law § 40.15). Specifically, defendant wanted the jurors to accept that he killed Ms. Webdale while in the throes of what his primary

expert, Dr. Spencer Eth, during direct examination called a "sudden psychotic act."

According to Dr. Eth, defendant murdered Ms. Webdale "when he was suffering an acute exacerbation of sudden intensification of severe psychotic symptoms and his brain was not functioning[, which meant that] his motor control—he could walk, he could thrust out his arms, he could see, but he couldn't think, he couldn't plan, he couldn't intend, he couldn't know as we understand what know means what he was doing or that it was wrong." During cross-examination, Dr. Eth denied describing the incident as a "sudden psychotic moment," and declined to characterize it as a "sudden psychotic attack," although he essentially had testified to this effect. As an alternative description of his diagnosis, he offered that, at the moment of the killing, "a ferocious torrence [*sic*] of symptoms overwhelmed [defendant's] mind," thereby precluding him from planning or "execut[ing] an action with reason and intent."

Another of defendant's experts, Dr. Wilfred Van Gorp, provided similar testimony, telling the jurors that he agreed with Dr. Eth's conclusion that defendant suffered a "transient episode of extreme psychotic symptomology that destroyed his capacity to appreciate the nature and consequences of his conduct and to appreciate that his conduct was wrong." Both experts opined that the "transient episode" essentially began directly before and ended almost immediately after the killing—a "symptomatic exacerbation while on the station platform."

But defendant's expert testimony, which hinged on defendant's supposed inability to intend or plan, ran directly counter to the prior testimony of witnesses to the crime, who described how defendant had engaged in seemingly meticulous planning. According to eyewitness testimony, before approaching the blond Ms. Webdale and immediately after being rebuffed by another blond woman, defendant walked to the front of the subway platform, the best vantage point from which to see a train entering the curved station. Bending over, defendant peered up the tracks, concededly looking for the headlights of an oncoming train. He then walked back towards Ms. Webdale, who was standing near the platform's edge, and asked her the time. Following Ms. Webdale's response, defendant positioned himself directly behind her, standing with his back to the wall of the station. Notably, he chose to stand behind Ms. Webdale rather than the other blond woman, who was taller and heavier. As the

train proceeded through the station, defendant rushed forward and shoved Ms. Webdale at the precise moment when she would pitch headlong into the train's path without any chance to save herself or be rescued. Despite having moved with great force (he pushed off from the back wall), defendant had sufficient presence of mind to break his momentum and avoid sharing Ms. Webdale's fate by twisting his body away from the platform's edge. As the trial prosecutor told the jurors during summation, "actions speak louder than words."

This description of events by the People's fact witnesses, which defendant did not challenge, contradicted the defense experts' assertions that a theorized "acute exacerbation" prevented defendant from planning or intending. Another facet of the attack also undermined defendant's supposed inability to comprehend that his conduct was wrong. Immediately after killing Ms. Webdale, he announced "I'm sick," and asked to be taken to a hospital, which displayed his understanding that he indeed had done something wrong and needed an excuse to negate his blameworthiness.

In addition to the facts of the murder, the People also refuted defendant's affirmative defense with the testimony of their rebuttal experts. These experts attacked the legitimacy of the defense theory that defendant had acted while experiencing a fleeting psychotic disorder or "transient episode," and they did so independently of the four challenged observations. Specifically, Dr. Angela Hegarty explained to the jurors that, according to the Diagnostic and Statistical Manual of Mental Disorders (DSM), the standard classification of mental disorders used by mental health professionals in the United States, psychotic symptoms simply do not rapidly appear and disappear as defendant's supposedly did while he stood on the subway platform. Rather, the DSM makes clear that the shortest duration for a brief psychotic disorder is one day. Dr. William Bryon Barr, the People's other expert, offered similar testimony.

Although defendant adduced expert testimony that consumed thousands of pages of trial transcript (as did the People), that, standing alone, does not compel a conclusion that he proffered such a strong case that the error here could not have been harmless. As we have noted,

> "before constitutional error . . . may be found to be harmless, it is not necessary that the untainted evidence on which the verdict in the case must be sup-

ported demonstrate undisputable guilt. Rather, the reasonable doubt standard, extremely high though it is, still leaves room for judgmental determination of harmlessness" (*People v Schaeffer*, 56 NY2d 448, 455 [1982]).

In other words, a court engaging in harmless error review should center its analysis not on the quantity of the evidence adduced, but rather on its quality (*see id.* ["because consideration of whether an error is harmless requires an evaluation not only of the tainted matter, but of the strength of the case absent the taint, the court must focus on the reliability and persuasiveness of the untainted matter and its source. . . . In short, neither side of the evidentiary equation may be ignored; in the end, the picture must be seen as a whole"]).

Significantly, the trial court instructed the jurors to engage in a similar inquiry, explaining that defendant had to prove that he "was not criminally responsible" by "a preponderance of the credible evidence[, which] is evidence which you find worthy of belief." The court amplified its instruction by stating that defendant would meet his burden if "you, the jury, are satisfied that the evidence of lack of criminal responsibility, from whatever source, outweighs and is more convincing than the evidence that he was criminally responsible when he committed the crime." Finally, the jurors were informed that "[a]s with any other factual issue, it is the quality of the evidence which controls, not the number of witnesses on one side or the other."

Ultimately, defendant's criminal responsibility does not seem to have presented a close case in the minds of the jurors. They deliberated for no more than two hours, during which they apparently lunched as well. The jurors sent no notes. Clearly, no problematic issues arose during these brief deliberations. I find it impossible to believe that in those two hours, the jurors were only able to dismiss defendant's "transient episode" theory by focusing on the four isolated comments cited by the majority. Far more likely, the jurors readily rejected what they must have viewed as a rather outlandish defense theory, unsupported as it was in fact or professional literature.

Evaluating the "importance" of the four comments to the case, however, the majority concludes that the People "drew some significant support" from them (majority op at 129, 130). But even assuming that the jurors, like the majority, zeroed in on these four comments, they were generally duplicated or corroborated by other evidence in the record, thereby diminishing

their hypothesized potential significance to the jurors' deliberations. For example, the majority asserts that the record contains "no clearer proof" of defendant's "habit of announcing his mental illness the moment he got in trouble" (majority op at 130) than John P.'s statement that, after attacking a woman at a Waldbaum's supermarket, defendant repeated "I'm sick, I'm sick, I'm schizophrenic." As the majority acknowledges, however, there is evidence in the record that defendant made similar statements following other instances of aggressive behavior. And John P.'s statement is not disputed. Defendant's primary expert, Dr. Eth, acknowledged on cross-examination that defendant announced to John P. that he was sick and a psychiatric patient, and begged him not to call the police. As for Kimberly D.'s apparent* observation that Kendra Webdale bore a "rather remarkable" resemblance to another woman, Stephanie H., who had teased defendant, the jury heard from another witness that both women were blond, and that Stephanie H. had teased defendant. Moreover, as the majority points out, Stephanie H.'s and Kendra Webdale's photographs were admitted into evidence. As a result, the jurors were free to make their own judgment about any resemblance between the two women, assuming they found this important, and either to credit or discount Dr. Hegarty's testimony accordingly. It is also worth noting that Dr. Hegarty testified that while interviewing defendant, she mentioned Stephanie H. inadvertently, and defendant became visibly sexually aroused. This speaks far more powerfully to "inappropriate behavior that reflected defendant's sexual frustration" (majority op at 131) than does the third chal-

---

* From the transcript, it is not entirely clear to me whether Dr. Hegarty was testifying that Kimberly D. told her that Stephanie H. and Kendra Webdale resembled each other, or was offering her own view on this subject. After Dr. Hegarty testified that Kimberly D. told her that Stephanie H. teased defendant, defense counsel objected based on the "right to confrontation," and the trial court overruled the objection. Then the prosecutor asked Dr. Hegarty two questions about Stephanie H. (her last name and occupation). After Dr. Hegarty answered these two questions, the prosecutor asked her "And did you learn anything about [Stephanie H.'s] general appearance?" to which Dr. Hegarty responded "Yes. She bears a rather remarkable similarity and appearance to Kendra Webdale." In context, the prosecutor might having been asking Dr. Hegarty if she had learned this information about Stephanie H.'s general appearance from Kimberly D., but this is far from certain, especially since Dr. Hegarty surely had access to the photographs of both women. Defense counsel did not object to the question or answer about Stephanie H.'s "general appearance," which were followed by Dr. Hegarty's testimony about defendant's reaction when she inadvertently mentioned Stephanie H. to him during an interview.

lenged observation by Serita G. that defendant, naked on a bed, did not cover up when her maid entered his room. Finally, Issac V.'s statement that, close in time to the killing, defendant appeared "a little weird," is, if anything, innocuous. True, the People's experts opined that defendant had a "relatively mild" mental disorder. But defendant's "transient episode" theory also called for him to act relatively normally immediately preceding the attack.

In short, I see no possibility that the four hearsay comments caused the jurors to reject defendant's affirmative defense. Rather, his defense was subverted by the incredible nature of his psychiatric theory coupled with his uncontested actions, which contradicted any "transient" loss of control or comprehension. Because any *Crawford* error that occurred here was harmless beyond a reasonable doubt (*see Chapman v California*, 386 US 18, 24 [1967]; *People v Crimmins*, 36 NY2d 230, 240-241 [1975]), defendant's conviction should be affirmed.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSENBLATT and GRAFFEO concur with Judge R.S. SMITH; Judge READ dissents and votes to affirm in a separate opinion.

Order reversed, etc.