(November 24, 2009)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v OMAR MONTES, Appellant. [893 NYS2d 515]—

Judgment, Supreme Court, New York County (Edwin Torres, J.), rendered May 10, 2006, convicting defendant, after a jury trial, of criminal possession of a weapon in the third degree, and sentencing him to a term of seven years, affirmed.

On June 3, 2004, in response to a 4:00 A.M. radio communication of "shots fired," police found Robinson "Tito" Lopez dead behind a building at 1952 Second Avenue. The medical examiner found that Lopez had died from multiple gunshot wounds that had perforated his vital organs.

Eyewitness testimony established that, immediately before the shooting, Lopez was involved in an argument with two women, his ex-girlfriend Loraine Ceballo and her friend Tamika Taylor. During the argument, Lopez made insulting remarks about Charles Gonzalez, Ceballo's current boyfriend. In response to a telephone call from Ceballo, Gonzalez arrived on the scene about 10 minutes later accompanied by defendant. After the two men located Lopez in the parking lot in the back of the building, a confrontation erupted. Shortly thereafter, Lopez was shot and killed.

Investigation of the scene revealed one deformed bullet and nine .380 caliber shell casings. Ballistics testing established that, of the nine shell casings, six had been fired by one gun and the remaining three by another gun. All four recovered bullets—the deformed bullet recovered at the scene and the three bullets recovered during the autopsy—were found to have been fired by the same gun. However, officers were unable to link the bullets to the shell casings.

At trial, Ceballo testified that she followed Gonzalez and defendant to the back of the building. Although her view of Lopez was blocked, she watched Gonzalez and defendant approach Lopez's car. There, according to Ceballo, she saw both Gonzalez and defendant raise their hands "in a fist form," and saw that they were holding something in their hands. Although Ceballo said at trial that she could not identify the objects in the men's hands, she had told detectives who interviewed her that she saw them holding guns, and had testified similarly in her grand jury testimony.

Ceballo further testified that after she heard three gunshots, she immediately ran back towards the building, and that Gonzalez and defendant ran right past her, through the lobby. Notably, Ceballo testified that she did not see anything in either Gonzalez's or defendant's hands as they ran.

According to evidence read into the record by the People, during the trial, after Ceballo testified, she and Taylor were brought back to the prosecutor's office and reinterviewed. Taylor, who had not yet testified, denied being present during the shooting. However, after Ceballo left the room, Taylor admitted to the prosecutor that she had been present during the shooting. Taylor added that Gonzalez put a gun or guns in Ceballo's purse after the shooting.

After Ceballo returned to the room, Taylor confronted her about whether Gonzalez had put a gun in her purse. At that point, Ceballo acknowledged that Gonzalez had in fact placed a gun or guns in her purse. Ceballo went "back and forth" on

whether she received one or two guns, and said that she did not know.

The next day, Taylor testified that, immediately after the shooting, Gonzalez and defendant ran to the back entrance of the building, and she and Ceballo ran into the building with the two men. According to Taylor, Gonzalez put at least one gun in Ceballo's purse. As Gonzalez and defendant fled through an exit door, Ceballo boarded the elevator with Taylor and asked, "What am I going to do with the guns? . . . I don't want this in my house."

Following Taylor's testimony, defense counsel asked to recall Ceballo but was told that she was no longer available because she had suffered a breakdown and had attempted suicide. Defendant moved for a mistrial or, alternatively, to strike Ceballo's testimony, on the grounds that he was denied his right to confront Ceballo regarding the gun or guns.

The trial court denied defendant's motion, finding that the issue of whether Ceballo was given one or more guns was a minor portion of her testimony. The next day, the court made the following record explaining its decision:

"[T]wo days ago, the witness Loraine Ceballo was subjected to a consummately skillful and exhaustive cross-examination. All encompassing, grueling, scathing, and repeatedly reduced her to tears and the breaking point. Add to this the palpable abject terror she communicated, the lethal factions this most reluctant, this fine young woman finds her in the middle of. The culmination? Loraine Ceballo had a psychotic breakdown that night, attempting suicide twice. Through nobody's fault, she is unavailable for further examination by either side. The end result is that Tamika Taylor's testimony will remain uncontroverted, and this, it appears, in no way indisposes the defense, either tactically or strategically.

"To vitiate all her testimony as proposed by defense counsel is too drastic a measure . . . akin to throwing out the baby with the bath water."

Later in the trial, defendant made a request for a missing witness charge for Ceballo, asserting that he was being denied his confrontation rights, especially with respect to the issue of whether one gun or two were dropped into Ceballo's purse. After the court denied the missing witness charge, defendant and the People entered a stipulation with respect to Ceballo. The stipulation stated in relevant part: "Loraine Ceballo was not honest when she testified in that she failed to state that . . . Gonzalez . . . gave her the gun or guns when he ran past her after the shooting occurred. When first confronted at the

District Attorney's office that Carlos Gonzalez placed weapons in her purse, Loraine Ceballo had denied that this had occurred. When confronted by Tamika Taylor about this matter, Loraine Ceballo immediately stated that . . . Gonzalez shoved a weapon or weapons into her purse and that she took the purse containing the weapon or weapons up to her apartment. Loraine Ceballo is unavailable to be recalled by either side."

The jury acquitted defendant of murder in the second degree and criminal possession of a weapon in the second degree, but convicted him of criminal possession of a weapon in the third degree. (Penal Law § 265.02 [former (4)].) After the jury left, defendant moved to set aside the verdict as repugnant, which motion was denied.

At the sentencing proceeding, counsel presented letters from about 30 individuals from the community attesting to defendant's good character. Defendant maintained his innocence and asked for leniency. The court expressed the view that defendant was a joint actor with Gonzalez in bringing about Lopez's death. Defendant was sentenced, as a second felony offender, to the statutory maximum of seven years in prison, with five years of postrelease supervision.

On appeal, defendant claims that he was denied his constitutional right to confront Ceballo pursuant to US Constitution Amendments VI and XIV, and NY Constitution article I, § 6. Specifically, he argues that he was deprived of the opportunity to recall Ceballo in order to bring her credibility into question and draw attention to her apparent role in the shooting. Additionally, defendant argues that Ceballo may have testified that she received only one gun, thereby providing evidence supporting his innocence. Defendant also claims that his sentence was excessive and should be reduced. For the reasons set forth below, we find these arguments unavailing and affirm the ruling of the trial court.

It is well established that the Confrontation Clause of the Sixth Amendment protects a criminal defendant's right to question the witnesses against him. However, trial judges retain wide latitude to impose reasonable limits on such interactions (*Delaware v Van Arsdall*, 475 US 673, 678-679 [1986]). " '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish' " (*id.* at 679, quoting *Delaware v Fensterer*, 474 US 15, 20 [1985]).

Here, the trial court did not abuse its discretion in denying defendant's request to recall Ceballo, or in the alternative to strike the testimony. Defendant had already had a full op-

portunity to cross-examine Ceballo. As the trial court stated in its decision on defendant's motion, "Ceballo was subjected to a consummately skillful and exhaustive cross-examination." In particular, defendant had the opportunity to cross-examine Ceballo about Gonzalez's and defendant's actions after the shooting including what they did as they were fleeing the scene. Thus, defendant's right to confront Ceballo was protected, since he was afforded the "opportunity to probe and expose . . . infirmities" in Ceballo's testimony (*Delaware v Fensterer*, 474 US at 22; *see People v Mercado*, 237 AD2d 200 [1997], *lv denied* 90 NY2d 895 [1997]). Ultimately, it was not Ceballo's testimony, but her friend Taylor's, that raised the question of how many guns were dropped into Ceballo's purse. Further, another witness also testified as to conversations about two guns. In this respect, defense counsel had ample opportunity to engage in cross-examination of two witnesses on the issue. Moreover, by drawing attention to the ambiguities in the two witnesses' testimony, as well as focusing on Ceballo's dishonesty, the defendant, in his summation, "was afforded ample scope to present the theory of defense to which the proffered evidence purportedly related" (*People v Isaacs*, 272 AD2d 159 [2000], *lv denied* 95 NY2d 854 [2000]).

Furthermore, defendant was able to bring his arguments before the jury by means of a stipulation providing that Ceballo was dishonest and that she was unclear as to whether one or two guns were placed into her purse. Indeed, by this stipulation, the issue of Ceballo's credibility was resolved entirely against the People, and this, in itself, weighs heavily against a finding of a constitutional violation (*see People v Alicea*, 33 AD3d 326, 328 [2006], *lv denied* 7 NY3d 923 [2006]).

In any event, even if the trial court erred by failing to declare a mistrial or striking Ceballo's testimony, we find that the error was harmless as the evidence amply established defendant's guilt of criminal possession of weapon in the third degree. The forensics evidence demonstrated that at the crime scene, there were nine discharged shell casings, all of which were fresh. Further, the evidence showed that six of the shell casings had been fired from one gun and the other three had been fired from another gun, thus indicating that there were two guns, not one, at the scene.

As for defendant's challenge to his sentence, it is not disputed that defendant had a prior felony conviction on his record, nor does defendant dispute that the crime for which he was convicted arose out of the shooting death of Tito Lopez. Thus, we do not find it necessary to substitute our discretion for that of the trial court to reduce the sentence.

Motion seeking leave to file pro se supplemental brief and related relief denied. Concur—Gonzalez, P.J., Tom, Catterson and Richter, JJ.

Abdus-Salaam, J., dissents in a memorandum as follows: I must respectfully dissent and would reverse the conviction on the ground that the trial court abused its discretion in failing to strike Ceballo's testimony. This error was a violation of defendant's constitutional rights under the Confrontation Clause and under the circumstances was not harmless beyond a reasonable doubt (*see People v Goldstein*, 6 NY3d 119, 129 [2005], *cert denied* 547 US 1159 [2006]).

Contrary to the majority's conclusion that if the trial court erred, the error was harmless because the evidence, even without Ceballo's testimony, amply established defendant's guilt of criminal possession of a weapon in the third degree, Ceballo was the sole individual who offered eyewitness testimony indicating that defendant might have had a gun. She testified that although her view of the victim Lopez was blocked, she saw both Gonzalez and defendant raise their hands "in a fist form," and saw that they were holding something in their hands, although she could not identify the objects.

The only other person who offered an eyewitness account was Dominick Castro, who described himself as a close friend of Lopez's and who was there in the parking lot when the shooting occurred. He testified that defendant did not have a gun in his hand and that only Gonzalez had a gun. Castro testified that during the incident, defendant was standing in the parking lot with his hands crossed in front of him. According to Castro, Gonzalez confronted Lopez face to face, abruptly shot him and then ran after him and continued to shoot him, while defendant stood at a distance and watched. Thus, without Ceballo's testimony, there was no eyewitness testimony as to defendant's guilt, only eyewitness testimony to the contrary.

As noted by the majority, Ceballo testified that after the shooting, Gonzalez and defendant ran right past her through the lobby. She made no mention before the jury of Gonzalez placing a gun or guns into her purse. This stunning and significant revelation was made at the prosecutor's office after Ceballo had concluded her testimony, and only because Ceballo's friend Tamika Taylor first admitted to prosecutors at that time that she, together with Ceballo, had been present during the shooting. Defendant was not able to recall Ceballo because he was told that she was unavailable due to suffering a breakdown.

The question of whether Ceballo received one or two guns had evidentiary significance with respect to whether defendant

was armed. Ceballo and Castro gave sharply contradictory accounts of whether defendant was holding a gun or any object at all, and the jury had to determine whether defendant was armed with a gun. In that regard, whether Gonzalez had given Ceballo one or two guns was important. Of course, had Gonzalez only given Ceballo one gun, that would not have negated the possibility that defendant had also been armed with a gun. But it made sense in terms of the testimony that if Gonzalez and defendant had both come running into the building after the shooting, and they both had guns, that both guns would have been handed to Ceballo. She was the only witness who could answer that question based on personal knowledge, and defendant had a basic constitutional right to confront her about this matter through cross-examination (*People v Chin*, 67 NY2d 22, 27 [1986]).

Defendant's inability to cross-examine Ceballo regarding this revelation about the gun or guns prevented defendant from questioning her about facts closely related to the crime (*see generally United States v Cardillo*, 316 F2d 606, 611 [2d Cir 1963], *cert denied* 375 US 857 [1963]; *People v Vargas*, 88 NY2d 363, 380 [1996]). The fact that Gonzalez had given Ceballo a gun or guns right after the shooting was not a collateral matter that had nothing to do with the incident (*compare People v Rodriguez*, 24 AD3d 394 [2005], *lv denied* 6 NY3d 837 [2006] [the trial court properly exercised its discretion in refusing to strike the victim's testimony after he asserted a Fifth Amendment privilege in response to a single question on cross-examination that related to a collateral matter pertaining only to credibility]).

The " 'ultimate question must be whether the defendant's inability to test the accuracy of the witness' direct examination has been such as to create a substantial risk of prejudice' (McCormick, Evidence § 140, at 347 [3d ed]; *see generally*, Ann., 55 ALR Fed 742)" (*People v Chin*, 67 NY2d at 28). The trial court's reasoning that whether or not Ceballo took a gun or guns from Gonzalez was only "a minor portion of the totality of her testimony" and that accordingly the motion to strike Ceballo's testimony should be denied, is puzzling. The issue of the number of guns was obviously significant because both Gonzalez and defendant had been with the victim in the parking lot and there was a jury question as to whether they had both possessed guns.

The majority's conclusion that defendant had already been afforded a full opportunity to cross-examine Ceballo misses the point that defendant had no opportunity to cross-examine her regarding the bombshell revelation about having been given the

gun or guns. Furthermore, while the majority observes that defense counsel had ample opportunity to cross-examine Ceballo's friend Tamika Taylor, as well as another witness, regarding conversations about two guns, this was no substitute for cross-examination of Ceballo, who was the only one with personal knowledge as to whether she had been given one or two guns. Taylor's testimony was confused and inherently inconsistent with respect to whether there was one gun or there were two guns.[1] The other witness to whom the majority refers was Carlos Pino, who was incarcerated for a drug conviction and who was brought downstate from prison to testify for the prosecution only after Ceballo made her surprise revelation about having been given the weapon(s).

Pino testified that he knew Taylor, who is his son's godmother, Ceballo, Gonzalez and defendant. He testified that on the night of the shooting, he called Taylor, who told him that Gonzalez had shot Lopez. That same night, he received a phone call from defendant asking him to call Taylor to find out what "that girl did with them things," which Pino understood to mean Ceballo and the guns. According to Pino, Taylor also told him that after the shooting, Gonzalez had stuck the guns in Ceballo's bag. He was certain that Taylor had said "two" guns. On cross-examination, defense counsel elicited from this prosecution witness that he had about five months remaining on his prison term and that the detectives who had retrieved him from prison and escorted him to the courthouse to testify had told him that he was a witness to a murder case and that if he lied on the stand he could be penalized and "catch another case," that is be charged with another crime.

Defendant's opportunity to cross-examine these two witnesses, neither of whom had personal knowledge of whether Ceballo had been given one or two guns, was insufficient to cure the considerable prejudice created by defendant's inability to cross-examine Ceballo on this issue.

The stipulation that was read to the jury stating that Ceballo was not honest when she testified in that she failed to state that Gonzalez had given her the gun or guns when he ran past her after the shooting occurred, was no substitute for the right

---

1. She testified that she saw Gonzalez put something in Ceballo's purse and that when she and Ceballo were in the elevator, Ceballo remarked, "What am I going to do with the guns?" When asked by the court whether she saw what was in the purse, Taylor responded, "No. She told me he put the gun in my purse," but she also said, "I saw the gun." When the court asked how many guns she had seen, Taylor said, "I don't remember" and that "I did see one." She repeated that she saw one gun and did not know if there was a second gun.

to confront Ceballo. As stated by the Court of Appeals in *People v Chin*: "[S]tipulations cannot substitute for confrontation, because confrontation envisions 'a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief' (*Mattox v United States*, 156 US 237, 242-243)" (67 NY2d at 30 n 3).

The majority's reliance on *People v Alicea* (33 AD3d 326 [2006], *lv denied* 7 NY3d 923 [2006]), for the proposition that through this stipulation, the issue of Ceballo's credibility was resolved entirely against the People, and that this factor weighs heavily against finding a constitutional violation, is misplaced. In *Alicea*, this Court found that the trial court had properly exercised its discretion in denying defendant permission to recall one of the People's witnesses for further cross-examination on newly acquired information. However, significantly, in *Alicea*, unlike here, the information had little impact on the witness's credibility, and defendant had the opportunity to acquire the information earlier in the proceeding (*see also People v Crawford*, 39 AD3d 426 [2007], *lv denied* 9 NY3d 864 [2007] [the court properly exercised its discretion in denying the defendant's request to recall the victim in order to lay a foundation to introduce a prior inconsistent statement which had minimal impeachment value and which had been previously disclosed to the defense]).

In contrast, Ceballo's admission that she had hidden the weapon or weapons used to kill the victim went to the heart of her credibility and was a surprise to both the prosecution and the defense. While this Court concluded in *Alicea* that the defendant had been afforded a full opportunity to impeach the witness and that there was no impairment of defendant's right of confrontation, the circumstances here are starkly different.

Because the failure to strike Ceballo's testimony was an error that violated defendant's constitutional rights, the test for harmless error applies: that is, "[t]he People must show that any error was harmless beyond a reasonable doubt" (*People v Goldstein*, 6 NY3d at 129). In so deciding, this Court must "consider both the overall strength of the case against defendant and the importance to that case of the improperly admitted evidence." (*Id.*)

As noted, Ceballo was the only eyewitness who indicated that she saw defendant holding something in his hand before the

victim was shot. If her entire testimony is struck, what remains is the testimony of Castro, who testified that Gonzalez alone was the shooter, that defendant was not holding a gun and that defendant just stood there during the shooting; the testimony of Taylor, who stated that she did not see the shooting and did not know whether Gonzalez had given Ceballo one or two guns; and the testimony of Pino, the convicted felon, who related what had been said to him about two guns by Taylor (who had lied to the prosecutor until the eleventh hour about not having been present during the shooting) and by defendant.

There was also evidence that one bullet and nine .380 caliber shell casings had been recovered and that six casings had been fired from one gun and the remaining three from another gun. All of the shell casings were "fresh," meaning that they did not appear to have been there for any length of time because they were not crushed or disturbed, but the People's witnesses could not tell how long the casings had been in the parking lot. There was testimony from a firearms analyst that the bullets found in the victim's body and the deformed bullet found at the scene had all come from the same gun, but that witness could not determine whether the bullets had been fired from the same gun as the shell casings.

I disagree with the majority's conclusion that even without Ceballo's testimony, the forensic evidence amply established defendant's guilt of criminal possession of a weapon in the third degree. The majority states that because the casings were fired from two guns, this indicates that there were two guns, not one at the scene. But while we know that there was at least one gun at the scene at the time of the incident because the victim was shot and killed, *the forensic evidence does not show that there were two guns at the scene at the time of the shooting,* only that at some point, there was a gun fired in the parking lot that was different from the gun that was used to shoot the victim.

The overall strength of the People's evidence against defendant was "far from overwhelming" (*Brinson v Walker,* 547 F3d 387, 396 [2d Cir 2008]; *compare People v Johnson,* 60 AD3d 425 [2009] [although it was error to admit the nontestifying codefendant's plea allocution in that this violated the Confrontation Clause, the error was harmless because there was overwhelming evidence of defendant's guilt]). The case against defendant is greatly diminished in the absence of Ceballo's testimony that she saw defendant in the parking lot with Gonzalez and that both defendant and Gonzalez raised their hands "in a fist form" and were holding objects in their hands just before the victim was shot. Here, as in *People v Goldstein* (6

NY3d at 130), "[t]he People's case drew some significant support from the improperly admitted [evidence]." The People have failed to show beyond a reasonable doubt that the failure to strike Ceballo's testimony was harmless error.

As was emphasized by the Court of Appeals in *Goldstein* (6 NY3d at 132), while noting the "unwelcome consequences"[2] of ordering a new trial, "the constitutional rules that guarantee defendants a fair trial must be enforced, and few such rules are more important than the one that guarantees defendants the right to confront the witnesses against them." The Supreme Court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt" (*Delaware v Van Arsdall*, 475 US 673, 681 [1986]). I do not believe that this Court can confidently say that the constitutional error committed in this case was harmless beyond a reasonable doubt.

Accordingly, the conviction should be reversed and the case remitted for a new trial.

---

2. This is the infamous Kendra Webdale case. Defendant had pushed Ms. Webdale into the path of an approaching subway train. He was charged with murder in the second degree and his principal defense was insanity. The first trial ended in a hung jury. The second jury convicted him of second degree murder. Although the Court of Appeals was troubled by "the tangible cost of a third trial, and by the intangible cost of the long delay in resolving [the] case" (6 NY3d at 132) as well as the knowledge that another trial would bring pain to the victim's family, it reversed the conviction and ordered a new trial because defendant's constitutional right under the Confrontation Clause was violated when a psychiatrist who testified recounted statements made by people who were not available for cross-examination.