Justice Thomas,
concurring in the judgment.
I agree with the plurality that the disclosure of Cellmark’s out-of-court statements through the expert testimony of Sandra Lambatos did not violate the Confrontation Clause. I reach this conclusion, however, solely because Cellmark’s *104 statements lacked the requisite “formality and solemnity” to be considered “ ‘testimonial’ ” for purposes of the Confrontation Clause. See Michigan v. Bryant, 562 U. S. 344, 378 (2011) (Thomas, J., concurring in judgment). As I explain below, I share the dissent’s view of the plurality’s flawed analysis.
I
The threshold question in this case is whether Cellmark’s statements were hearsay at all. As the Court has explained, “[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.” Crawford v. Washington, 541 U. S. 36, 60, n. 9 (2004) (citing Tennessee v. Street, 471 U. S. 409, 414 (1985)). Here, the State of Illinois contends that Cellmark’s statements—that it successfully derived a male DNA profile and that the profile came from L. J.’s swabs—were introduced only to show the basis of Lambatos’ opinion, and not for their truth. In my view, however, there was no plausible reason for the introduction of Cellmark’s statements other than to establish their truth.
A
Illinois Rule of Evidence 703 (2011) and its federal counterpart permit an expert to base his opinion on facts about which he lacks personal knowledge and to disclose those facts to the trier of fact. Relying on these Rules, the State contends that the facts on which an expert’s opinion relies are not to be considered for their truth, but only to explain the basis of his opinion. See People v. Pasch, 152 Ill. 2d 133, 176, 604 N. E. 2d 294, 311 (1992) (“By allowing an expert to reveal the information for this purpose alone, it will undoubtedly aid the jury in assessing the value of his opinion”); see also Advisory Committee’s 2000 Notes on Fed. Rule Evid. 703, 28 U. S. C. App., p. 361 (stating that expert basis testimony is admissible “only for the purpose of assisting the jury in evaluating an expert’s opinion”). Accordingly, in the *105 State’s view, the disclosure of expert “basis testimony” does not implicate the Confrontation Clause.
I do not think that rules of evidence should so easily trump a defendant’s confrontation right. To be sure, we should not “lightly swee[p] away an accepted rule” of federal or state evidence law, ante, at 57 (internal quotation marks omitted), when applying the Confrontation Clause. “Rules of limited admissibility are commonplace in evidence law.” Mnookin, Expert Evidence and the Confrontation Clause After Crawford v. Washington, 15 J. L. & Pol’y 791, 812 (2007). And, we often presume that courts and juries follow limiting instructions. See, e. g., Street, supra, at 415, n. 6. But we have recognized that concepts central to the application of the Confrontation Clause are ultimately matters of federal constitutional law that are not dictated by state or federal evidentiary rules. See Barber v. Page, 390 U. S. 719, 724-725 (1968) (defining a constitutional standard for whether a witness is “ ‘unavailable’ ” for purposes of the Confrontation Clause); see also Ohio v. Roberts, 448 U. S. 56, 76 (1980) (recognizing that Barber “explored the issue of constitutional unavailability” (emphasis added)). Likewise, we have held that limiting instructions may be insufficient in some circumstances to protect against violations of the Confrontation Clause. See Bruton v. United States, 391 U. S. 123 (1968).
Of particular importance here, we have made sure that an out-of-court statement was introduced for a “legitimate, nonhearsay purpose” before relying on the not-for-its-truth rationale to dismiss the application of the Confrontation Clause. See Street, 471 U. S., at 417 (emphasis added). In Street, the defendant testified that he gave a false confession because police coerced him into parroting his accomplice’s confession. Id., at 411. On rebuttal, the prosecution introduced the accomplice’s confession to demonstrate to the jury the ways in which the two confessions differed. Id., at 411-412. Finding no Confrontation Clause problem, this Court held that the accomplice’s out-of-court confession was not in *106 troduced for its truth, but only to impeach the defendant’s version of events. Id., at 413-414. Although the Court noted that the confession was not hearsay “under traditional rules of evidence,” id., at 413, the Court did not accept that nonhearsay label at face value. Instead, the Court thoroughly examined the use of the out-of-court confession and the efficacy of a limiting instruction before concluding that the Confrontation Clause was satisfied “[i]n this context.” Id., at 417.
Unlike the confession in Street, statements introduced to explain the basis of an expert’s opinion are not introduced for a plausible nonhearsay purpose. There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert’s opinion and disclosing that statement for its truth. “To use the inadmissible information in evaluating the expert’s testimony, the jury must make a preliminary judgment about whether this information is true.” D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence § 4.10.1, p. 196 (2d ed. 2011) (hereinafter Kaye). “If the jury believes that the basis evidence is true, it will likely also believe that the expert’s reliance is justified; inversely, if the jury doubts the accuracy or validity of the basis evidence, it will be skeptical of the expert’s conclusions.” Ibid.[1]
Contrary to the plurality’s suggestion, this commonsense conclusion is not undermined by any longstanding historical *107 practice exempting expert basis testimony from the rigors of the Confrontation Clause. Prior to the adoption of the Federal Rules of Evidence in 1975, an expert could render an opinion based only on facts, that the expert had personally perceived or facts that the expert learned at trial, either by listening to the testimony of other witnesses or through a hypothetical question based on facts in evidence. See Advisory Committee’s 2000 Notes on Fed. Rule Evid. 703, 28 U. S. C. App., p. 361; 29 C. Wright & V. Gold, Federal Practice and Procedure § 6271, pp. 300-301 (1997) (hereinafter Wright); 1 K. Broun et al., McCormick on Evidence § 14, p. 86 (6th ed. 2006) (hereinafter Broun); Kaye § 4.6, at 156-157. In those situations, there was little danger that the expert would rely on testimonial hearsay that was not subject to confrontation because the expert and the witnesses on whom he relied were present at trial. It was not until 1975 that the universe of facts upon which an expert could rely was expanded to include facts of the case that the expert learned out of court by means other than his own perception. 1 Broun § 14, at 87; Kaye § 4.6, at 157. It is the expert’s disclosure of those facts that raises Confrontation Clause concerns.[2]
B
Those concerns are fully applicable in this case. Lam-batos opined that petitioner’s DNA profile matched the male profile derived from L. J.’s vaginal swabs. In reaching that *108 conclusion, Lambatos relied on Cellmark’s out-of-court statements that the profile it reported was in fact derived from L. J.’s swabs, rather than from some other source. Thus, the validity of Lambatos’ opinion ultimately turned on the truth of Cellmark’s statements. The plurality’s assertion that Cellmark’s statements were merely relayed to explain “the assumptions on which [Lambatos’] opinion rest[ed],” ante, at 58, overlooks that the value of Lambatos’ testimony depended on the truth of those very assumptions.[3]
It is no answer to say that other nonhearsay evidence established the basis of the expert’s opinion. Here, Lam-batos disclosed Cellmark’s statements that it generated a male DNA profile from L. J.’s swabs, but other evidence showed that L. J.’s swabs contained semen and that the swabs were shipped to and received from Cellmark. Ante, at 61. That evidence did not render Cellmark’s statements superfluous. Of course, evidence that Cellmark received L. J.’s swabs and later produced a DNA profile is some indication that Cellmark in fact generated the profile from those swabs, rather than from some other source (or from no source at all). Cf. Melendez-Diaz v. Massachusetts, 557 U. S. 305, 319 (2009) (citing brief that describes “cases of documented ‘drylabbing’ where forensic analysts report results of tests that were never performed,” including DNA tests). *109 But the only direct evidence to that effect was Cellmark’s statement, which Lambatos relayed to the factfinder. In any' event, the factfinder’s ability to rely on other evidence to evaluate an expert’s opinion does not alter the conclusion that basis testimony is admitted for its truth. The existence of other evidence corroborating the basis testimony may render any Confrontation Clause violation harmless, but it does not change the purpose of such testimony and thereby place it outside of the reach of the Confrontation Clause.[4] I would thus conclude that Cellmark’s statements were introduced for their truth.
C
The plurality’s contrary conclusion may seem of little consequence to those who view DNA testing and other forms of “hard science” as intrinsically reliable. But see Melendez-Diaz, supra, at 318 (“Forensic evidence is not uniquely immune from the risk of manipulation”). Today’s holding, however, will reach beyond scientific evidence to ordinary out-of-court statements. For example, it is not uncommon for experts to rely on interviews with third parties in forming their opinions. See, e. g., People v. Goldstein, 6 N. Y. 3d 119, 123-124, 843 N. E. 2d 727, 729-730 (2005) (psychiatrist disclosed statements made by the defendant’s acquaintances *110 as part of the basis of her opinion that the defendant was motivated to kill by his feelings of sexual frustration).
It is no answer to say that “safeguards” in the rules of evidence will prevent the abuse of basis testimony. Ante, at 80. To begin with, courts may be willing to conclude that an expert is not acting as a “mere condui[t]” for hearsay, ibid., as long as he simply provides some opinion based on that hearsay. See Brief for Respondent 18, n. 4 (collecting cases). In addition, the hearsay may be the kind of fact on which experts in a field reasonably rely. See Fed. Rule Evid. 703; Goldstein, supra, at 125, 843 N. E. 2d, at 731 (evidence showed that reputable psychiatrists relied upon third-party interviews in forming their opinions). Of course, some courts may determine that hearsay of this sort is not substantially more probative than prejudicial and therefore should not be disclosed under Rule 703. But that balancing test is no substitute for a constitutional provision that has already struck the balance in favor of the accused. See Crawford, 541 U. S., at 61 (“[The Confrontation Clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination”).
II
A
Having concluded that the statements at issue here were introduced for their truth, I turn to whether they were “testimonial” for purposes of the Confrontation Clause. In Crawford, the Court explained that “[tjhe text of the Confrontation Clause . . . applies to ‘witnesses’ against the accused—in other words, those who ‘bear testimony.’ ” Id., at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). “‘Testimony,’” in turn, is “‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” 541 U. S., at 51. In light of its text, I continue to think that the Confrontation *111 Clause regulates only the use of statements bearing “indicia of solemnity.” Davis v. Washington, 547 U. S. 813, 836-837, 840 (2006) (Thomas, J., concurring in judgment in part and dissenting in part). This test comports with history because solemnity marked the practices that the Confrontation Clause was designed to eliminate, namely, the ex parte examination of witnesses under the English bail and committal statutes passed during the reign of Queen Mary. See id., at 835; Bryant, 562 U. S., at 378 (Thomas, J., concurring in judgment); Crawford, supra, at 43-45. Accordingly, I have concluded that the Confrontation Clause reaches “‘formalized testimonial materials,’” such as depositions, affidavits, and prior testimony, or statements resulting from “ ‘formalized dialogue,”’ such as custodial interrogation. Bryant, supra, at 379; see also Davis, supra, at 836-837.[5]
Applying these principles, I conclude that Cellmark’s report is not a statement by a “witnesfe]” within the meaning of the Confrontation Clause. The Cellmark report lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained. See Report of Laboratory Examination (Feb. 15, 2001), Lodging of Petitioner. The report is signed by two “reviewers,” but they neither purport to have performed the DNA testing nor certify the accuracy of those who did. See ibid. And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation.
*112 The Cellmark report is distinguishable from the laboratory reports that we determined were testimonial in Melendez-Diaz, 557 U. S. 305, and in Bullcoming v. New Mexico, 564 U. S. 647 (2011). In Melendez-Diaz, the reports in question were “sworn to before a notary public by [the] analysts” who tested a substance for cocaine. 557 U. S., at 308. In Bullcoming, the report, though unsworn, included a “Certificate of Analyst” signed by the forensic analyst who tested the defendant’s blood sample. 564 U. S., at 653. The analyst “affirmed that ‘[t]he seal of th[e] sample was received intact and broken in the laboratory,’ that ‘the statements in [the analyst’s block of the report] are correct,’ and that he had ‘followed the procedures set out on the reverse of th[e] report.’” Ibid.
The dissent insists that the Bullcoming report and Cell-mark’s report are equally formal, separated only by such “minutia” as the fact that Cellmark’s report “is not labeled a ‘certificate.’ ” Post, at 139 (opinion of Kagan, J.). To the contrary, what distinguishes the two is that Cellmark’s report, in substance, certifies nothing. See supra, at 111. That distinction is constitutionally significant because the scope of the confrontation right is properly limited to extrajudicial statements similar in solemnity to the Marian examination practices that the Confrontation Clause was designed to prevent. See Davis, supra, at 835-836 (opinion of Thomas, J.). By certifying the truth of the analyst’s representations, the unsworn Bullcoming report bore “a ‘striking resemblance,’ ” 547 U. S., at 837 (quoting Crawford, 541 U. S., at 52), to the Marian practice in which magistrates examined witnesses, typically on oath, and “certified] the results to the court,” id., at 44. And, in Melendez-Diaz, we observed that “ ‘certificates’ are functionally identical to live, in-court testimony, doing ‘precisely what a witness does on direct examination.’ ” 557 U. S., at 310-311. Cellmark’s report is marked by no such indicia of solemnity.
*113 Contrary to the dissent’s suggestion, acknowledging that the Confrontation Clause is implicated only by formalized statements that are characterized by solemnity will not result in a prosecutorial conspiracy to elude confrontation by using only informal extrajudicial statements against an accused. As I have previously noted, the Confrontation Clause reaches bad-faith attempts to evade the formalized process. See supra, at 111, n. 5 (quoting Davis, supra, at 838). Moreover, the prosecution’s use of informal statements comes at a price. As the dissent recognizes, such statements are “less reliable” than formalized statements, post, at 140, and therefore less persuasive to the factfinder. Cf. post, at 137, n. 6 (arguing that prosecutors are unlikely to “ ‘forgo DNA evidence in favor of less reliable eyewitness testimony’ ” simply because the defendant is entitled to confront the DNA analyst). But, even assuming that the dissent accurately predicts an upswing in the use of “less reliable” informal statements, that result does not “turn the Confrontation Clause upside down.” Post, at 140. The Confrontation Clause does not require that evidence be reliable, Crawford, supra, at 61, but that the reliability of a specific “class of testimonial statements”—formalized statements bearing indicia of solemnity—be assessed through cross-examination, see Melendez-Diaz, supra, at 309-310.
B
Rather than apply the foregoing principles, the plurality invokes its “primary purpose” test. The original formulation of that test asked whether the primary purpose of an extrajudicial statement was “to establish or prove past events potentially relevant to later criminal prosecution.” Davis, supra, at 822. I agree that, for a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a *114 criminal prosecution. See Bryant, 562 U. S., at 380-381 (Scalia, J., dissenting). But this necessary criterion is not sufficient, for it sweeps into the ambit of the Confrontation Clause statements that lack formality and solemnity and is thus “disconnected from history.” Davis, 547 U. S., at 838-842 (Thomas, J., concurring in judgment in part and dissenting in part); Bryant, supra, at 378 (Thomas, J., concurring in judgment). In addition, a primary purpose inquiry divorced from solemnity is unworkable in practice. Davis, supra, at 839; Bryant, supra, at 379. Statements to police are often made both to resolve an ongoing emergency and to establish facts about a crime for potential prosecution. The primary purpose test gives courts no principled way to assign primacy to one of those purposes. Davis, supra, at 839. The solemnity requirement is not only true to the text and history of the Confrontation Clause, but goes a long way toward resolving that practical difficulty. If a statement bears the formality and solemnity necessary to come within the scope of the Clause, it is highly unlikely that the statement was primarily made to end an ongoing emergency.
The shortcomings of the original primary purpose test pale in comparison, however, to those plaguing the reformulated version that the plurality suggests today. The new primary purpose test asks whether an out-of-court statement has “the primary purpose of accusing a targeted individual of engaging in criminal conduct.” Ante, at 82. That test lacks any grounding in constitutional text, in history, or in logic.
The new test first requires that an out-of-court statement be made “for the purpose of proving the guilt of a particular criminal defendant.” Ante, at 84 (emphasis added). Under this formulation, statements made “before any suspect was identified” are beyond the scope of the Confrontation Clause. See ante, at 58. There is no textual justification, however, for limiting the confrontation right to statements made after the accused’s identity became known. To be sure, the Sixth *115 Amendment right to confrontation attaches “[i]n ... criminal prosecutions,” at which time the accused has been identified and apprehended. But the text of the Confrontation Clause does not constrain the time at which one becomes a “wit-nests].” Indeed, we have previously held that a declarant may become a “witnesfe]” before the accused’s prosecution. See Crawford, 541 U. S., at 50-51 (rejecting the view that the Confrontation Clause applies only to in-court testimony).
Historical practice confirms that a declarant could become a “witnes[s]” before the accused’s identity was known. As previously noted, the confrontation right was a response to ex parte examinations of witnesses in 16th-century England. Such examinations often occurred after an accused was arrested or bound over for trial, but some examinations occurred while the accused remained “unknown or fugitive.” J. Langbein, Prosecuting Crime in the Renaissance 90 (1974) (describing examples, including the deposition of a victim who was swindled out of 20 shillings by a “ ‘cunning man’ ”); see also 1 J. Stephen, A History of the Criminal Law of England 217-218 (1883) (describing the sworn examinations of witnesses by coroners, who were charged with investigating suspicious deaths by asking local citizens if they knew “who [was] culpable either of the act or of the force” (internal quotation marks omitted)).
There is also little logical justification for the plurality’s rule. The plurality characterizes Cellmark’s report as a statement elicited by police and made by Cellmark not “to accuse petitioner or to create evidence for use at trial,” but rather to resolve the ongoing emergency posed by “a dangerous rapist who was still at large.” Ante, at 84. But, as I have explained, that distinction is unworkable in light of the mixed purposes that often underlie statements to the police. See supra, at 114. The difficulty is only compounded by the plurality’s attempt to merge the purposes of both the police and the declarant. See ante, at 82; Bryant, supra, at 367-370 (majority opinion).
*116 But if one purpose must prevail, here it should surely be the evidentiary one, whether viewed from the perspective of the police, Cellmark, or both. The police confirmed the presence of semen on L. J.’s vaginal swabs on February 15, 2000, placed the swabs in a freezer, and waited until November 28, 2000, to ship them to Cellmark. App. 30-34, 51-52. Cellmark, in turn, did not send its report to the police until April 3, 2001, id., at 54, over a year after L. J.’s rape. Given this timeline, it strains credulity to assert that the police and Cellmark were primarily concerned with the exigencies of an ongoing emergency, rather than with producing evidence in the ordinary course.
In addition to requiring that an out-of-court statement “targe[t]” a particular accused, the plurality’s new primary purpose test also considers whether the statement is so “inherently inculpatory,” ante, at 58, that the declarant should have known that his statement would incriminate the accused. In this case, the plurality asserts that “[t]he technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating—or both,” ante, at 85, and thus “no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner,” ante, at 84.
Again, there is no textual justification for this limitation on the scope of the Confrontation Clause. In Melendez-Diaz, we held that “[t]he text of the [Sixth] Amendment contemplates two classes of witnesses—those against the defendant and those in his favor.” 557 U. S., at 313. We emphasized that “there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation.” Id., at 314. Thus, the distinction between those who make “inherently inculpatory” statements and those who make other statements that are merely “helpful to the prosecution” has no foundation in the text of the Amendment.
*117 It is also contrary to history. The 16th-century Marian statutes instructed magistrates to transcribe any information by witnesses that “ ‘shall be material to prove the felony.’” See, e.g., 1 Stephen, supra, at 219 (quoting 1 & 2 Phil. & Mary, ch. 13 (1554)). Magistrates in the 17th and 18th centuries were also advised by practice manuals to take the ex parte examination of a witness even if his evidence was “weak” or the witness was “unable to inform any material thing against” an accused. J. Beattie, Crime and the Courts in England: 1660-1800, p. 272 (1986) (internal quotation marks omitted). Thus, neither law nor practice limited ex parte examinations to those witnesses who made “inherently inculpatory” statements.
This requirement also makes little sense. A statement that is not facially inculpatory may turn out to be highly probative of a defendant’s guilt when considered with other evidence. Recognizing this point, we previously rejected the view that a witness is not subject to confrontation if his testimony is “inculpatory only when taken together with other evidence.” Melendez-Diaz, supra, at 313. I see no justification for reviving that discredited approach, and the plurality offers none.[6]
* * *
Respondent and its amici have emphasized the economic and logistical burdens that would be visited upon States should every analyst who reports DNA results be required to testify at trial. See, e. g., ante, at 85 (citing brief stating that some crime labs use up to 12 technicians when testing *118 a DNA sample). These burdens are largely the product of a primary purpose test that reaches out-of-court statements well beyond the historical scope of the Confrontation Clause and thus sweeps in a broad range of sources on which modern experts regularly rely. The proper solution to this problem is not to carve out a Confrontation Clause exception for expert testimony that is rooted only in legal fiction. See ante, at 58. Nor is it to create a new primary purpose test that ensures that DNA evidence is treated differently. See ibid. Rather, the solution is to adopt a reading of the Confrontation Clause that respects its historically limited application to a narrow class of statements bearing indicia of solemnity. In forgoing that approach, today’s decision diminishes the Confrontation Clause’s protection in cases where experts convey the contents of solemn, formalized statements to explain the bases for their opinions. These are the very cases in which the accused should “enjoy the right ... to be confronted with the witnesses against him.”

 The plurality relies heavily on the fact that this case involved a bench trial, emphasizing that a judge sitting as factfinder is presumed—more so than a jury—to “understand the limited reason for the disclosure” of basis testimony and to “not rely on that information for any improper purpose.” Ante, at 69. Even accepting that presumption, the point is not that the factfinder is unable to understand the restricted purpose for basis testimony. Instead, the point is that the purportedly “limited reason” for such testimony—to aid the factfinder in evaluating the expert’s opinion—necessarily entails an evaluation of whether the basis testimony is true.

 In its discussion of history, the plurality relies on Beckwith v. Sydebotham, 1 Camp. 116, 170 Eng. Rep. 897 (K. B. 1807). In that case, experts were asked to render opinions on a ship’s seaworthiness based on facts read into court from the sworn ex parte deposition of a witness who purported to have seen the ship’s deficiencies. To be sure, Beckwith involved expert reliance on testimonial hearsay. But Beckwith was an English case decided after the ratification of the Confrontation Clause, and this form of expert testimony does not appear to have been a common feature of early American evidentiary practice. See 29 Wright § 6271, at 300-301; 1 Broun § 14, at 86-87; Kaye § 4.6, at 156-157.

 Cellmark’s statements were not introduced for the nonhearsay purpose of showing their effect on Lambatos—i. e., to explain what prompted her to search the DNA database for a match. See, e. g., 30B M. Graham, Federal Practice and Procedure § 7034.1, pp. 521-529 (interim ed. 2011) (noting that out-of-court statements introduced for their effect on listener do not implicate the Confrontation Clause). The statements that Lambatos conveyed went well beyond what was necessary to explain why she performed the search. Lambatos did not merely disclose that she received a DNA profile from Cellmark. Rather, she further disclosed Cellmark’s statements that the profile was “male” and that it was “found in semen from the vaginal swabs of [L. J.].” App. 56. Those facts had nothing to do with her decision to conduct a search. They were introduced for their truth.

 The plurality concludes that the Confrontation Clause would not be implicated here “even if the record did not contain any [other] evidence that could rationally support a finding that Cellmark produced a scientifically reliable DNA profile based on L. J.’s vaginal swabs.” Ante, at 76. But, far from establishing a “legitimate” nonhearsay purpose for Cell-mark’s statements, Tennessee v. Street, 471 U. S. 409, 417 (1985), a complete lack of other evidence tending to prove the facts conveyed by Cell-mark’s statements would completely refute the not-for-its-truth rationale. The trial court, in announcing its verdict, expressly concluded that petitioner’s DNA matched the “DNA ... in the semen recovered from the victim’s vagina.” 4 Record JJJ151. Absent other evidence, it would have been impossible for the trial court to reach that conclusion without relying on the truth of Cellmark’s statement that its test results were based on the semen from L. J.’s swabs.

 In addition, I have stated that, because the Confrontation Clause “sought to regulate prosecutorial abuse occurring through use of ex parte statements,” it “also reaches the use of technically informal statements when used to evade the formalized process.” Davis, 547 U. S., at 838 (opinion concurring in judgment in part and dissenting in part). But, in this ease, there is no indication that Cellmark’s statements were offered “in order to evade confrontation.” Id., at 840.

 The plurality states that its test “will not prejudice any defendant who really wishes to probe the reliability” of out-of-court statements introduced in his case because the person or persons who made the statements “may always be subpoenaed by the defense and questioned at trial.” Ante, at 58-59. Melendez-Diaz rejected this reasoning as well, holding that the defendant’s subpoena power “is no substitute for the right of confrontation.” 557 U. S., at 324.