Garlick v. Lee

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

AUGUST TERM 2020
No. 20-1796

**JAMES GARLICK,**
*Petitioner-Appellee,*

v.

**SUPERINTENDENT WILLIAM LEE, EASTERN CORRECTIONAL FACILITY,**
*Respondent-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: MARCH 12, 2021
DECIDED: JUNE 11, 2021

Before:      WESLEY, SULLIVAN, and MENASHI, *Circuit Judges*.

In 2013, Petitioner-Appellee James Garlick was convicted by a jury in state court of first-degree manslaughter. At trial, an autopsy report—prepared at the request of law enforcement during an active homicide investigation—was admitted into evidence over Garlick's objection through a witness who had not participated in the autopsy or in the preparation of the autopsy report. On appeal, the First

Department affirmed the conviction, concluding that Garlick's Sixth Amendment right of confrontation was not violated because the autopsy report did not link the commission of the crime to Garlick and therefore was not testimonial. *People v. Garlick*, 144 A.D.3d 605, 606 (N.Y. App. Div. 1st Dep't 2016).

Garlick subsequently filed a petition for a writ of habeas corpus in federal court pursuant to the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254. The district court granted his petition because the First Department's adjudication of Garlick's appeal was an "unreasonable application of clearly established federal law regarding the testimonial nature of certified out-of-court statements." *Garlick v. Lee*, 464 F. Supp. 3d 611, 621 (S.D.N.Y. 2020); *see* 28 U.S.C. § 2254(d)(1). We agree and **AFFIRM** the judgment of the district court.

————

MATTHEW BOVA (Robert S. Dean, *on the brief*), Center for Appellate Litigation, New York, New York, *for Petitioner-Appellee*.

JOSHUA P. WEISS, Assistant District Attorney (Nancy D. Killian, Peter D. Coddington, Robert C. McIver, Assistant District Attorneys, *on the brief*), *for* Darcel D. Clark, Bronx County District Attorney, Bronx, New York, *for Respondent-Appellant*.

————

MENASHI, *Circuit Judge*:

Respondent-Appellant William Lee, Superintendent of the Eastern Correctional Facility, appeals from the final judgment of the district court granting Petitioner-Appellee James Garlick's petition for a writ of habeas corpus pursuant to the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254. In 2013, Garlick was convicted by a jury in state court of first-degree manslaughter. At trial, an autopsy report—prepared at the request of law enforcement during an active homicide investigation—was admitted into evidence over Garlick's objection through a witness who had not participated in the autopsy or in the preparation of the autopsy report. Garlick appealed his conviction, arguing that the introduction of the autopsy report violated his Sixth Amendment right of confrontation. The state appellate court affirmed the conviction on the ground that Garlick's right of confrontation was not violated because the autopsy report did not link the commission of the crime to Garlick and therefore was not testimonial. *People v. Garlick*, 144 A.D.3d 605, 606 (N.Y. App. Div. 1st Dep't 2016). We conclude that this decision involved "an unreasonable application" of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, we **AFFIRM** the judgment of the district court granting a writ of habeas corpus to Garlick.

## BACKGROUND

### I

On November 1, 2011, police responded to a report of an assault at an apartment building in the Bronx. The responding police officer found the victim, Gabriel Sherwood, bleeding on the floor in the building lobby. The victim was pronounced dead at the hospital.

That same evening, Detective Thomas DeGrazia, the lead homicide detective assigned to the case, initiated an investigation and sought video footage from the building's surveillance video. The video footage showed a man struggling with the victim in the lobby and a woman repeatedly striking the victim on the head. Both attackers—and another woman present during the attack—fled the scene.

Later that evening, the police identified the female attacker as Johanna Rivera and arrested her as a suspect in the victim's homicide. In a post-arrest interrogation, Rivera identified Garlick as the male attacker in the video. At 4:45 a.m. on November 2, 2011, Detective DeGrazia issued a department-wide notification to arrest Garlick for his involvement in the homicide.

On November 1, 2011, the same evening as the murder, Detective DeGrazia also notified staff at the New York City Office of the Chief Medical Examiner ("OCME") of the need for an autopsy of the victim's body and arranged for the body's transport. He informed the OCME staff of details of the incident, including that the body appeared to have multiple stab wounds. With this information, the OCME prepared a "Notice of Death" form, dated November 1, 2011, that stated: "Circumstances of death: App. manner: Homicide." App'x 290. The OCME also prepared a "Supplemental Case Information" sheet, which documented the conversation with Detective DeGrazia and noted that the victim was found with multiple stab wounds in the lobby of a Bronx apartment building. App'x 291.

The following day, on November 2, 2011, Dr. Katherine Maloney of the OCME performed the autopsy with Dr. James Gill and

4

two Bronx homicide detectives present. Dr. Maloney then prepared an autopsy report concluding that the victim's cause of death was a "stab wound of torso with perforation of heart" and the manner of death was "homicide." App'x 275. The autopsy report is titled "Report of Autopsy" and bears several official seals including that of the OCME. App'x 275. The first page of the autopsy report includes the following certification:

> I hereby certify that I, Katherine Maloney, M.D., City Medical Examiner — I, have performed an autopsy on the body of Gabriel Sherwood, on the 2nd of November, 2011, commencing at 9:00AM in the Bronx Mortuary of the Office of Chief Medical Examiner of the City of New York.

App'x 276. Fiber recovered during the autopsy was "submitted to evidence per the usual protocol." App'x 280.

A "Case Worksheet" was prepared at the same time as the report by Dr. Maloney and bears her signature. According to the Case Worksheet, the immediate cause of death was a "[s]tab wound of torso with perforation of heart." App'x 285. After receiving Dr. Maloney's findings, the police decided not to pursue a murder charge against Johanna Rivera and instead sought to charge Garlick with murder because, as Detective DeGrazia testified, "the medical examiner made it clear that it was the stab wounds that caused the death." Trial Tr. at 277, *Garlick v. Lee*, 464 F. Supp. 3d 611 (S.D.N.Y. 2020) (No. 18-CV-11038), ECF No. 13-7.

Following his arrest on November 11, 2011, Garlick told the police that the victim had been sexually harassing his girlfriend, Lisa Rivera; that he and the victim began fighting outside of the apartment building and then moved into the lobby; that the victim brandished

5

what he thought was a weapon; that the two struggled for it; and that he did not have a knife. He asserted that he was only trying to defend himself and his girlfriend.

On December 29, 2011, after receiving the forensic toxicology and microscopic analysis reports, Dr. Maloney finalized the autopsy report. Dr. Maloney certified that she performed the autopsy, and she signed the autopsy report.[1] The OCME certified the autopsy report as a business record under New York's statutory business-record rule and affixed the official OCME seal. As mandated by state and local law, the OCME then delivered the signed autopsy report to the Bronx District Attorney's Office. *See* N.Y. County Law § 677(4); *see also* N.Y. City Charter § 557(g); N.Y. C.P.L.R. § 4520.

## II

On November 28, 2011, Garlick was indicted for murder, first-degree manslaughter (intent to cause serious physical injury), and assault with a dangerous weapon (first and second degree) in Bronx County Court. *See* N.Y. Penal Law §§ 125.25(1), 125.20(1), 120.10(1), 120.05(2).

At trial, the State introduced the autopsy report through the testimony of Dr. Susan Ely of the OCME. Garlick objected, arguing that introducing the autopsy report through Dr. Ely's testimony would violate his right of confrontation under the Sixth Amendment because Dr. Ely did not prepare the autopsy report and was not

---

[1] The report notes that the draft report was prepared on November 2, 2011, and the final report was prepared on December 29, 2011. Those dates are separately signed and dated. App'x 280.

involved in the victim's autopsy.[2] Relying on *People v. Freycinet*, 11 N.Y.3d 38 (2008), and *People v. Hall*, 84 A.D.3d 79 (N.Y. App. Div. 1st Dep't 2011), the trial court held that it was "proper to allow a witness to testify to the contents of an autopsy" even if the witness had not participated in the autopsy or the preparation of the autopsy report. Trial Tr. at 22, *Garlick*, 464 F. Supp. 3d 611, ECF No. 13. The trial court admitted the autopsy report as a business record, based on Dr. Ely's testimony laying a foundation, and Dr. Ely then testified about the contents of the report as an expert in the fields of clinical, anatomic, and forensic pathology.

The State relied heavily on the autopsy report throughout the trial. In its opening statement, the State referenced the report to describe the victim's wounds and promised that Dr. Ely would provide the details. The State used the autopsy report to eliminate Johanna Rivera as a potential cause of the victim's death. Because the video of the incident presented at trial did not clearly show that Garlick had a knife and because Garlick denied ever possessing a knife, the State connected Garlick to the victim's knife wounds by relying on the conclusions in the autopsy report. The State also offered the autopsy report as evidence of Garlick's intent to cause serious physical injury. Finally, the State relied on the autopsy report in its closing argument, recounting Dr. Ely's testimony about the victim's wounds and describing the report's conclusions as the "final diagnosis" of the victim's "cause of death." Trial Tr. at 449, 452-53, *Garlick*, 464 F. Supp. 3d 611, ECF No. 13-12.

---

[2] The State indicated that Dr. Maloney, who prepared the report, and Dr. Gill, who was present at the autopsy, no longer worked at the OCME but did not otherwise explain why they were unavailable to testify.

The jury convicted Garlick of first-degree manslaughter and acquitted him of the murder charge. He was sentenced to twenty years' imprisonment and five years of supervised release. He is currently serving that sentence.

## III

Garlick appealed his conviction to the Appellate Division, First Department, arguing that the autopsy report was testimonial and therefore should not have been admitted through a surrogate witness. The First Department disagreed and held that Garlick's right of confrontation "was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner" because the report "did not link the commission of the crime to a particular person" and therefore "was not testimonial." *People v. Garlick*, 144 A.D.3d 605, 606 (2016) (alteration omitted) (quoting *People v. Acevedo*, 112 A.D.3d 454, 455 (N.Y. App. Div. 1st Dep't 2013), and *People v. John*, 27 N.Y.3d 294, 315 (2016)). The First Department also rejected Garlick's argument that *People v. Freycinet*, 11 N.Y.3d 38 (2008), which held that an autopsy report was not testimonial, had been undermined by subsequent decisions of the Supreme Court of the United States. *Garlick*, 144 A.D.3d at 606 (citing *Acevedo*, 112 A.D.3d at 455). Garlick unsuccessfully applied for leave to appeal to the New York Court of Appeals, *People v. Garlick*, 29 N.Y.3d 948 (2017), and unsuccessfully petitioned the Supreme Court for a writ of certiorari, *Garlick v. New York*, 138 S. Ct. 502 (2017).

## IV

On November 27, 2018, Garlick sought a writ of habeas corpus pursuant to the Antiterrorism and Effective Death Penalty Act

("AEDPA"), 28 U.S.C. § 2254(d)(1). The magistrate judge concluded that *People v. Freycinet* and its progeny did not reflect current Supreme Court precedent applying the Sixth Amendment's Confrontation Clause but nevertheless denied Garlick's petition for not meeting the exacting standard for habeas relief under the AEDPA. *Garlick v. Miller*, No. 18-CV-11038, 2020 WL 2857464, at *5-29 (S.D.N.Y. Apr. 27, 2020), *report and recommendation adopted in part, rejected in part sub nom. Garlick*, 464 F. Supp. 3d 611.

The district court rejected the recommendation. Adopting substantially all of the magistrate judge's analysis of the issues and conclusions of law, the district court granted habeas relief on the ground that the First Department's ruling unreasonably applied clearly established federal law. *Garlick*, 464 F. Supp. 3d at 618-21. Respondent-Appellant Lee timely appealed.

## STANDARD OF REVIEW

We review *de novo* a district court's decision to grant a petition for a writ of habeas corpus. *Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir. 2003).

Because of the deference afforded to state courts under the AEDPA, we consider a state court's error to be harmless "unless it had substantial and injurious effect or influence in determining the jury's verdict." *Alvarez v. Ercole*, 763 F.3d 223, 233 (2d Cir. 2014). Whether a Confrontation Clause violation amounts to harmless error depends on "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and … the overall strength of the

prosecution's case." *Cotto v. Herbert*, 331 F.3d 217, 254 (2d Cir. 2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

## DISCUSSION

On appeal, Garlick argues that the state court's decision approving the admission of the autopsy report through a surrogate witness at trial was an unreasonable application of clearly established federal law under the AEDPA. *See* 28 U.S.C. § 2254(d)(1). We agree and affirm the district court's grant of habeas relief.

## I

A federal court may grant habeas relief if the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). When judging whether a state court decision was contrary to, or an unreasonable application of, Supreme Court precedent, we measure the last state-court adjudication of the petitioner's claim on the merits "against [the Supreme] Court's precedents as of the time the state court render[ed] its decision." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (internal quotation marks omitted); *Greene v. Fisher*, 565 U.S. 34, 40 (2011).

"A principle is clearly established Federal law for § 2254(d)(1) purposes only when it is embodied in a Supreme Court holding, framed at the appropriate level of generality." *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (internal quotation marks, citation, and alteration omitted). "A state court decision is contrary to such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the

10

Supreme Court on a question of law or has decided a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Id.* (internal quotation marks omitted). An unreasonable application of clearly established federal law occurs when "the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case, so that the state court's ruling on the claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (internal quotation marks, alterations, and citation omitted). The question therefore "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

## II

To decide whether the First Department's adjudication involved an unreasonable application of clearly established federal law, we begin with the Supreme Court's Confrontation Clause precedents.

## A

In *Crawford v. Washington*, the Supreme Court considered whether the defendant's wife's tape-recorded statement to police could be entered into evidence even though the wife was exempt from cross-examination by the marital privilege. 541 U.S. 36, 40 (2004). The Court held that regardless of its "indicia of reliability," a testimonial statement such as the tape recording is inadmissible without an opportunity for cross-examination of the declarant. *Id.* at 68-69. The

11

Court noted "[v]arious formulations" for defining the "core class of 'testimonial' statements":

- "*ex parte* in-court testimony or its functional equivalent— that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,"

- "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and

- "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.* at 51-52 (alterations and citations omitted). The Court explained that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard," *id.* at 52, and therefore the Confrontation Clause would not allow the admission of the tape recording absent "unavailability [of the declarant] and a prior opportunity for cross-examination," *id.* at 68. The reliability of a testimonial statement may be determined only "by testing in the crucible of cross-examination." *Id.* at 61.

**B**

The Supreme Court applied this holding to forensic reports in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), in which the Court concluded that certificates attesting to the laboratory analysis of a suspected controlled substance fell "within the core class of

12

testimonial statements" that required an opportunity for cross-examination. *Id.* at 310.

In *Melendez-Diaz*, the defendant objected to the trial court's admission into evidence of three certificates that confirmed that the substance seized from his person was cocaine. *Id.* at 308-09. The defendant argued that because he had no opportunity to confront the analysts who performed the forensic tests, the admission violated his Sixth Amendment right of confrontation. *Id*. at 309. The Supreme Court agreed. *Id*. at 329.

The Court explained that the certificates were "quite plainly affidavits"; the certificates were "sworn to by the declarant before an officer authorized to administer oaths" and thus "incontrovertibly" amounted to a "'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 310 (quoting *Crawford*, 541 U.S. at 51). The Court further noted that the certificates were "functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination." *Id.* at 310-11 (internal quotation marks omitted). And the certificates were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," especially because "under Massachusetts law the *sole purpose* of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." *Id.* at 311 (internal quotation marks and citation omitted). For these reasons, "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that [Melendez-Diaz] had a prior opportunity to cross-examine them," the certificates were inadmissible without an opportunity to cross-examine the analysts who prepared those documents. *Id.*

The Court addressed several arguments advanced by the State in favor of admissibility. First, the Court rejected the argument that the analysts who prepared the certificates were not subject to confrontation "because they are not 'accusatory' witnesses, in that they do not directly accuse petitioner of wrongdoing" and their "testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband." *Id.* at 313. The Court explained that "the analysts were witnesses" and "provided testimony *against* petitioner, proving one fact necessary for his conviction—that the substance he possessed was cocaine." *Id.* There is no category of witnesses who are "helpful to the prosecution" but "somehow immune from confrontation." *Id.* at 314.

Second, the Court rejected the argument that scientific reports should be admissible based on indicia of reliability. *Id.* at 318. The Court explained that even statements which result from purportedly "neutral scientific testing" must be subject to cross-examination because such tests are not necessarily "as neutral or as reliable" as advertised and are not "uniquely immune from the risk of manipulation." *Id.* Because confrontation "is designed to weed out not only the fraudulent analyst, but the incompetent one as well … an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination" and may reveal the "[s]erious deficiencies [that] have been found in the forensic evidence used in criminal trials." *Id.* at 319-20. Even scientific testing and expert analysis rely on subjective judgments about which tests to perform and how to interpret the results. *See id.* at 320. The exercise of such judgment "presents a risk of error that might be explored on cross-examination." *Id.* The Court said this is "true of many of the other types of forensic evidence commonly used in criminal prosecutions"

14

because there is "wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material." *Id.* at 320-21.

Third, the Court rejected the argument that the Confrontation Clause allows an exception for public or business records. *Id.* at 321. While a document kept in the regular course of business ordinarily may be admitted at trial despite its hearsay status, such a document may not be admitted without confrontation if "the regularly conducted business activity is the production of evidence for use at trial." *Id.* Similarly, public records are generally admissible unless such records reflect "matters observed by police officers and other law-enforcement personnel" in criminal cases. *Id.* at 322 (quoting Fed. R. of Evid. 803(8)). Accordingly, testimonial statements cannot be admitted into evidence as business or public records without confrontation. *Id.* at 324.[3]

## C

In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Court reaffirmed that forensic reports—even those prepared by analysts who purportedly act as "mere scrivener[s]" of machine-generated results—are testimonial statements that are inadmissible without confrontation. *Id.* at 659. The defendant was arrested on charges of driving while intoxicated, and the principal evidence against him was a laboratory report certifying that his blood-alcohol concentration was above the legal limit. *Id.* at 651. The trial court admitted the report

---

[3] At Garlick's trial, the court admitted the autopsy report as a business record, but Lee does not argue in this appeal that the report was admissible solely on that basis.

through a surrogate witness on the ground that the analyst who prepared the report "'was a mere scrivener,' who 'simply transcribed the results generated by the gas chromatograph machine.'" *Id.* at 657.

The Supreme Court disagreed, holding that "[i]n all material respects, the laboratory report in this case resembles those in *Melendez-Diaz*." *Id.* at 664. "[A]s in *Melendez-Diaz*, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations," and in both cases an analyst "tested the evidence and prepared a certificate concerning the result of his analysis" that was "'formalized' in a signed document" and thus was an affirmation "made for the purpose of establishing or proving some fact in a criminal proceeding." *Id.* at 664-65 (internal quotation marks omitted). The Court found it "[n]oteworthy" that the laboratory report contained a legend to aid law enforcement in the admission of certified blood-alcohol analyses in municipal and magistrate courts, making clear that the report would be available for use at a later trial. *Id.* at 665; *see also Melendez-Diaz*, 557 U.S. at 311; *Crawford,* 541 U.S. at 50-52.

Again, the Court addressed several counter-arguments for admitting the report without confrontation. First, the Court rejected the argument that the laboratory report was merely the number resulting from the blood alcohol test "scrivened" by the analyst; rather, the analyst who signed the report certified that he had received the sample intact, had checked that the sample corresponded to the correct report number, and had performed a particular test following a specified protocol. *Bullcoming*, 546 U.S. at 660. The testimony of a surrogate witness could not convey what the analyst who conducted the test "knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he

16

employed," and could not "expose any lapses or lies on the certifying analyst's part." *Id.* at 661-62. Moreover, the report allowed the analyst to identify any "circumstance or condition" that "affected the integrity of the sample or the validity of the analysis." *Id.* at 660 (alterations omitted). Representations relating to the presence or absence of such circumstances relate "to past events and human actions not revealed in raw, machine-produced data" and are "meet for cross-examination." *Id.*

Second, the Court rejected the argument that forensic reports that are purely observational and that do not accuse the defendant of wrongdoing are nontestimonial and therefore not subject to confrontation. The Court explained that *Melendez-Diaz* clarified that a document created "for an evidentiary purpose," and "made in aid of a police investigation," is testimonial. *Id.* at 664 (internal quotation marks omitted). Thus, even "observations of an independent scientist made according to a non-adversarial public duty" are testimonial if made in aid of a police investigation or if it were reasonably known that the observations would be available for use at a later trial. *Id.* (internal quotation marks and alteration omitted).

Third, the Court held that the absence of notarization does not change the report's testimonial status. Otherwise, the right to confrontation would become "easily erasable" because distinguishing between reports that are notarized and those that are not would "render inadmissible only sworn *ex parte* affidavits, while leaving admission of formal, but unsworn statements, 'perfectly OK.'" *Id.* (quoting *Crawford*, 541 U.S. at 52 n.3).

## D

In a later decision in which no opinion had the support of a majority of the Court, the Supreme Court considered whether "[o]ut-of-court statements that are related by [a testifying] expert solely for the purpose of explaining the assumptions on which [the expert's] opinion rests" are subject to the restrictions of the Confrontation Clause. *Williams v. Illinois*, 567 U.S. 50, 58 (2012) (plurality opinion). In *Williams*, a forensic expert testified at a bench trial that a DNA profile—prepared by an outside laboratory with evidence taken from the victim's body—matched another DNA profile produced by the state police from the defendant's blood. *Id.* at 56. A plurality of the Court concluded that the DNA profile prepared by the outside laboratory was not offered for its truth and therefore was not a testimonial statement subject to the Confrontation Clause. *Id.* at 57-58. The plurality reasoned that in a bench trial the judge sits as the trier of fact and will presumably "understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose." *Id.* at 69. The Court affirmed the judgment of the trial court admitting the testimony.

The plurality suggested that even if the underlying profile had been admitted for its truth, evidence that does not serve the primary purpose of accusing a targeted individual of wrongdoing is not testimonial. *Id.* at 84-86. But five justices disagreed, noting that *Melendez-Diaz* held that the Sixth Amendment contemplates only "two classes of witnesses—those against the defendant and those in his favor," *id.* at 116 (Thomas, J., concurring in the judgment) (quoting *Melendez-Diaz*, 557 U.S. at 313), and that prior cases had not held that a testimonial statement "must be meant to accuse a previously

18

identified individual; indeed, in *Melendez-Diaz*, we rejected a related argument that laboratory analysts are not subject to confrontation because they are not 'accusatory' witnesses," *id.* at 135 (Kagan, J., dissenting) (internal quotation marks omitted).

The plurality also suggested that the match provided "strong circumstantial evidence" that the outside laboratory's analysis was reliable and not the product of "shoddy or dishonest work." *Id.* at 76-77 (plurality opinion). But five justices objected that such evidence of reliability did not render the outside laboratory's profile admissible. *See id.* at 109 (Thomas, J., concurring in the judgment) ("The existence of other evidence corroborating the basis testimony … does not change the purpose of such testimony and thereby place it outside of the reach of the Confrontation Clause."); *id.* at 138 (Kagan, J., dissenting) ("It is not up to us to decide, *ex ante*, what evidence is trustworthy and what is not.").

Justice Thomas, concurring in the judgment, disagreed with the plurality's conclusion that the report was admissible because it was not offered for its truth. *Id.* at 106. Rather, he reasoned that the DNA profile was "not a statement by a witness within the meaning of the Confrontation Clause" because it lacked "the solemnity of an affidavit or deposition." *Id.* at 111 (internal quotation marks and alteration omitted). Justice Thomas concluded that the profile could be admitted because it was "neither a sworn nor a certified declaration of fact" and it did not "attest that its statements accurately reflect the DNA testing processes used or the results obtained." *Id.* No other justices embraced this reasoning.

Ordinarily, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices,

19

the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted). That rule produces no clear answer here because neither the plurality's nor Justice Thomas's rationale is necessarily narrower than the other. We have previously concluded that "*Williams* does not … yield a single, useful holding relevant to the case before us." *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013). That is the case here, and we therefore rely on Supreme Court precedent predating *Williams*. *Id.*[4]

## III

The First Department's decision, which was the last state-court adjudication of Garlick's claim on the merits, was an unreasonable application of clearly established federal law.

First, the state court adjudication was an incorrect application of clearly established Supreme Court precedent, under which the autopsy report is testimonial and admissible only with confrontation.[5] The autopsy report was "[a] solemn declaration or

---

[4] As we explain below, however, applying either the rationale of the *Williams* plurality or that of the Thomas concurrence would not alter our conclusion in this case. *See infra* note 6.

[5] Contrary to Lee's argument that Garlick's petition must be denied because the Supreme Court has never specifically held that an autopsy report is testimonial for purposes of the Confrontation Clause, Garlick need not identify "an identical factual pattern before a legal rule must be applied." *White v. Woodall*, 572 U.S. 415, 427 (2014). While the Supreme Court has not addressed autopsy reports in particular, the Court has plainly rejected the reasoning on which the First Department relied to hold the autopsy report admissible in Garlick's case.

affirmation made for the purposes of establishing or proving some fact." *Crawford*, 541 U.S. at 52; *see also Bullcoming*, 564 U.S. at 652. As in *Melendez-Diaz* and *Bullcoming*, law enforcement provided seized evidence—the victim's body—to a state laboratory required by law to assist in police investigations.

The autopsy was performed in aid of an active police investigation. Preparations for the autopsy commenced at Detective DeGrazia's request and the preliminary documents—including the "Notice of Death" and "Supplemental Case Information" forms—were created in anticipation of the autopsy and included details of the OCME staff's conversation with Detective DeGrazia. The autopsy was performed in the presence of another medical examiner and two detectives. After completing the autopsy, Dr. Maloney promptly notified law enforcement of her findings, and the police consequently dropped charges against Rivera and pursued a murder charge against Garlick. The circumstances under which the autopsy report was created would lead any objective witness to "believe that the [report] would be available for use at a later trial." *Crawford*, 541 U.S. at 52; *see also Melendez-Diaz*, 557 U.S. at 310; *Bullcoming*, 564 U.S. at 664. Later, the final, signed autopsy report was delivered to the Bronx District Attorney's Office; again, any objective witness—and Dr. Maloney in particular—would have expected that the statements contained in the report would be used in a later prosecution. *See Crawford*, 541 U.S. at 51-52; *Melendez-Diaz*, 557 U.S. at 310.

Just as in *Melendez-Diaz* and *Bullcoming*, the medical examiner "prepared a certificate concerning the result" of the examination that was "'formalized' in a signed document." *Bullcoming*, 564 U.S. at 664-65. Further indications of the report's solemnity include its formal title, "Report of Autopsy," the OCME seal, the certification that

Dr. Maloney performed the autopsy at the indicated date and time, and the initialed and dated "draft" and "final" dates indicating when the draft report was prepared and when it was finalized.

As intended, the autopsy report was used extensively at trial for the purpose of proving key facts—including, notably, that it was Garlick rather than Rivera who caused the victim's death. *See Crawford*, 541 U.S. at 40-41; *Bullcoming*, 564 U.S. at 655-66. The State used the autopsy report in its opening and closing statements to describe the victim's wounds. The State also used the autopsy report's conclusions on the manner and cause of death to eliminate Rivera as a potential cause of the victim's death and to prove Garlick's intent to cause serious physical injury. The conclusions contained in the autopsy report with respect to the nature of the wounds and the cause and manner of death were out-of-court substitutes for trial testimony, *see Bullcoming*, 564 U.S. at 670 (Sotomayor, J., concurring in part), that presented the very "risk of error that might be explored on cross-examination," *Melendez-Diaz*, 557 U.S. at 320. Under the applicable Supreme Court precedents, our conclusion is clear: the autopsy report is testimonial and was erroneously admitted without an opportunity for cross-examination.[6]

---

[6] Our conclusion would remain the same under either the plurality opinion or the Thomas concurrence in *Williams*. The autopsy report was not "related by" an expert during a bench trial "solely for the purpose of explaining the assumptions" behind the expert's testimony. *Williams*, 567 U.S. at 57-58 (plurality opinion). It was offered to prove the truth of the matter asserted to a jury, which would be impermissible even under the plurality's view. *See id.* at 72 ("Absent an evaluation of the risk of juror confusion and careful jury instructions, the testimony could not have gone to the jury."). And the autopsy report did not lack "indicia of solemnity." *Id.* at 111 (Thomas, J.,

Second, the state court adjudication not only incorrectly but also unreasonably applied clearly established law. Under the AEDPA, our inquiry does not end with the conclusion that the admission of the report was erroneous; the relevant question is not whether the state court's determination was incorrect but "whether that determination was unreasonable," which is "a substantially higher threshold." *Schriro*, 550 U.S. at 473. We hold that it was.

The First Department's decision affirming Garlick's conviction relied on *People v. Freycinet*, 11 N.Y.3d 38 (2008), and its progeny, *People v. John*, 27 N.Y.3d 294 (2016), and *People v. Acevedo*, 112 A.D.3d 454 (N.Y. App. Div. 1st Dep't 2013). In *Freycinet*—decided after *Crawford* but before *Melendez-Diaz* and *Bullcoming*—and more recently in *John*, the New York Court of Appeals held that statements which do not "directly link" the defendant to the crime are not testimonial. *Freycinet*, 11 N.Y.3d at 42; *see id.* ("The report is concerned only with what happened to the victim, not with who killed her."); *see also John*, 27 N.Y.3d at 315 ("[G]iven the primary purpose of a medical examiner in conducting autopsies, such redacted reports—'a contemporaneous, objective account of observable facts that do not link the commission of the crime to a particular person'—are not testimonial.") (alteration omitted).[7] Relying on *Freycinet*, the First

---

concurring in the judgment). It was certified, formalized, and bore an official seal.

[7] We note that *John* purported to find support for this proposition in this court's decision in *James*. *See John*, 27 N.Y.3d at 315 (citing *James*, 712 F.3d at 99). Yet *James* did not hold that autopsy reports do not "link the commission of the crime to a particular person." *John*, 27 N.Y.3d at 315. In fact, *James* cautioned that *Melendez-Diaz* and *Bullcoming* "cast doubt on any categorical designation of certain forensic reports as admissible in all cases." *James*, 712

Department held in *Acevedo* that a "[d]efendant's right of confrontation [is] not violated when an autopsy report prepared by a former medical examiner, who did not testify, [is] introduced through the testimony of another medical examiner." 112 A.D.3d at 455.

In this case, the First Department drew on these precedents to conclude that Garlick's right of confrontation was not violated because "the report, which '[did] not link the commission of the crime to a particular person,' was not testimonial." *Garlick*, 144 A.D.3d at 606 (quoting *John*, 27 N.Y.3d at 315).

This conclusion contradicts clearly established Supreme Court precedent. The Supreme Court has squarely rejected the argument that forensic reports that "do not directly accuse [the defendant] of wrongdoing," *Melendez-Diaz*, 557 U.S. at 313-14, or that are only "observations of an 'independent scientist' made 'according to a non-adversarial public duty,'" *Bullcoming*, 564 U.S. at 665 (alteration omitted), are not testimonial. There is no category of witnesses who are "helpful to the prosecution" but "somehow immune from confrontation." *Melendez-Diaz*, 557 U.S. at 314. The First Department's decision unreasonably relied on the existence of such a category. Even if a forensic report contains only "a contemporaneous, objective account of observable facts" that does not accuse a defendant, *John*, 27 N.Y.3d at 315, it is testimonial and the Confrontation Clause requires that the defendant be afforded the opportunity to cross-examine the declarant. *Melendez-Diaz*, 557 U.S. at 318-21; *Bullcoming,* 564 U.S. at 661-62; *Crawford,* 541 U.S. at 68-69. "The Constitution prescribes a procedure for determining the reliability of testimony in criminal

---

F.3d at 88. Nor did *James* hold that such linkage determines whether a statement is testimonial.

24

trials"—cross-examination—"and we, no less than the state courts, lack authority to replace it with one of our own devising." *Crawford*, 541 U.S. at 67.

**IV**

The unreasonably erroneous admission of the autopsy report at Garlick's trial was not harmless. At trial, the State introduced the autopsy report as its first exhibit and heavily relied on it in its opening and closing statements. The State used the autopsy report to eliminate Rivera as a potential cause of the victim's death. No other medical evidence was offered at trial to establish the cause and manner of the victim's death. The State also offered the autopsy report as evidence of Garlick's intent to cause serious physical injury. Moreover, no witness testified that Garlick had or used a knife during the attack, and Garlick denied that he had a knife. The autopsy report was the strongest evidence in the State's case and was not cumulative of other inculpatory evidence connecting Garlick to the victim's death.

Dr. Ely, who did not conduct or even participate in the autopsy, could not testify with respect to the procedures and methods that were followed in reaching its conclusions or to the qualifications of the examiner. Even rigorous cross-examination of Dr. Ely could not have adequately revealed any defects in the autopsy's methods, conclusions, and reliability.

**CONCLUSION**

In sum, we conclude that the admission of the autopsy report at Garlick's trial through a surrogate witness was an unreasonable application of clearly established Supreme Court precedent. Accordingly, we **AFFIRM** the judgment of the district court.