Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 74
The People &c.,
     Respondent,
    v.
Yoselyn Ortega,
     Appellant.

Abigail Everett, for appellant.
Dana Poole, for respondent.
The Innocence Project; District Attorneys Association of the State of New York, amici curiae.

SINGAS, J.:

At issue in this case is whether the admission of two autopsy reports through an expert witness who did not perform the autopsies, as well as that witness's testimony, violated defendant's Sixth Amendment right to confrontation where defendant had not

been given a prior opportunity to cross-examine the performing medical examiner. We hold that the admission of those reports and the expert witness's testimony violated defendant's constitutional right to confrontation, but conclude that the error was nevertheless harmless.

I.

In October 2012, defendant Yoselyn Ortega was employed as a nanny by a family living in Manhattan and entrusted with the care of three young children. On October 25, 2012, defendant brought two of those children, aged two and six, into a bathroom of their Upper West Side home where she repeatedly stabbed them, thereby killing them. Defendant was charged with two counts of murder in the first degree and two counts of murder in the second degree. During defendant's 2018 trial, she conceded that she had killed the two children but asserted a defense of not guilty by reason of insanity (*see* Penal Law § 40.15).

The autopsy reports of the two victims were admitted into evidence at trial through the People's witness, Dr. Susan Ely of the New York City Office of Chief Medical Examiner (OCME). Dr. Ely did not perform either autopsy, nor was she present when the autopsies were conducted. Still, after a review of the autopsy reports, dictation tapes, and autopsy photographs, Dr. Ely testified to the number, type, and pattern of the victims' wounds, as well as to the cause and manner of death of each child. The autopsies were performed, and the reports created, by Dr. James A. Hayes of OCME. It is undisputed that defendant lacked the prior opportunity to cross-examine Dr. Hayes regarding these reports.

Though the entirety of each report was available to the jury, the jury only viewed seven diagrams of the decedents' bodies. These diagrams were displayed during Dr. Ely's testimony. Three of the diagrams depicted the outline of a generic human body, with indications of where the victims sustained stab wounds. The other diagrams narrowed in on the victims' necks and the six-year-old victim's hands. On each diagram, Dr. Hayes had drawn the location of the victims' wounds and annotated these markings with descriptions of the size, location, and type of the respective wound. During jury deliberations, the jury requested to inspect the diagrams of the six-year-old victim's body; the jury did not request to view any other material from the autopsy reports.

Defendant objected to the admission of each autopsy report and Dr. Ely's testimony on the ground that they violated her constitutional right to confront the individual that conducted the autopsies. Supreme Court overruled defendant's objections. The jury ultimately found defendant guilty of two counts of murder in the first degree and two counts of murder in the second degree. The Appellate Division dismissed the two counts of murder in the second degree as "inclusory concurrent counts of the first-degree murder counts" and otherwise affirmed the judgment (202 AD3d 489, 492 [1st Dept 2022]). The Court agreed with Supreme Court that the admission of the autopsy reports through Dr. Ely did not violate defendant's right to confrontation, concluding that the reports were not testimonial because they " '[did] not link the commission of the crime to a particular person' " (*id.* at 491, quoting *People v John*, 27 NY3d 294, 315 [2016], and citing *People v Freycinet*, 11 NY3d 38, 42 [2008]). Regardless, the Court determined that "any error

was harmless under the standards for constitutional error" (*id.* at 492, citing *People v Crimmins*, 36 NY2d 230 [1975]).  A Judge of this Court granted defendant leave to appeal (38 NY3d 1073 [2022]).

## II.

## A.

The Sixth Amendment of the Federal Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against [them]" (US Const Amend VI).  Pursuant to this Confrontation Clause, a witness's out-of-court "testimonial" statement may only be admitted for its truth where the witness appears at trial or, if the witness is unavailable for trial, where the defendant has had a prior opportunity to cross-examine that witness (*Crawford v Washington*, 541 US 36, 68 [2004]).  In *Crawford*, the United States Supreme Court defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" (*id.* at 51 [internal quotation marks omitted]).  The Court provided several examples of the "core class of 'testimonial' statements" but acknowledged that "[v]arious formulations . . . exist" (*id.*).  These formulations include, as relevant here, "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' " (*id.* at 51-52 [internal quotation marks omitted]).

This Court had occasion to consider the impact of *Crawford* and its progeny on the admission of autopsy reports in *Freycinet*, where it held that a redacted autopsy report was

not testimonial for purposes of the Confrontation Clause (11 NY3d at 39). In reaching this conclusion, the Court evaluated four purported "indicia of testimoniality": (1) "the extent to which the entity conducting the procedure is an arm of law enforcement"; (2) "whether the contents of the report are a contemporaneous record of objective facts"; (3) "whether a pro-law-enforcement bias is likely to influence the contents of the report"; and (4) "whether the report's contents are directly accusatory in the sense that they explicitly link the defendant to the crime" (*id.* at 41 [internal quotation marks and citations omitted]). All four factors, the Court concluded, weighed in the People's favor and thus, the autopsy report at issue was not testimonial (*id.* at 42).

Though the United States Supreme Court has never considered the testimonial nature of autopsy reports, the Court did address the testimonial nature of forensic reports in a trilogy of cases that inform our analysis here. Shortly after *Freycinet*, the Supreme Court decided *Melendez-Diaz v Massachusetts*, in which the Court brought forensic reports directly within the ambit of the Confrontation Clause (557 US 305 [2009]). In that case, the Court considered whether sworn "certificates of analysis" were testimonial where the certificates concluded that a substance recovered from the petitioner was cocaine and further established the weight of that substance (*id.* at 308-309). The Court held that the certificates were testimonial because they were affidavits—"a solemn declaration or affirmation made for the purpose of establishing or proving some fact"—and the affidavits were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" (*id.* at 310-311, quoting

*Crawford*, 541 US at 51, 52 [internal quotation marks omitted]). In fact, the Court stated, "under Massachusetts law the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance" (*id.* at 311 [emphasis and internal quotation marks omitted]). Further, the certificates were "functionally identical to live-in-court testimony, doing 'precisely what a witness does on direct examination' " (*id.* at 310-311, quoting *Davis v Washington*, 547 US 813, 830 [2006]). As such, the "affidavits were testimonial statements, and the analysts were 'witnesses' " within the meaning of the Confrontation Clause (*id.* at 311). "Absent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to 'be confronted with' the analysts at trial" (*id.*, quoting *Crawford*, 541 US at 54 [internal quotation marks omitted]).

The Supreme Court emphasized that forensic evidence "is not uniquely immune from the risk of manipulation," particularly by law enforcement, nor is it insulated from the possibility of incompetence (*id.* at 318-319). The Court observed that "there is wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material" (*id.* at 320-321 [internal quotation marks omitted]). These issues "might be explored on cross-examination" and "there is little reason to believe that confrontation will be useless in testing analysts' honesty, proficiency, and methodology" (*id.* at 320).

Two years later in *Bullcoming v New Mexico,* the Supreme Court held that an unsworn forensic laboratory report certifying that a sample of the defendant's blood had an alcohol concentration above the legal limit was testimonial (564 US 647 [2011]). The report was materially similar to that in *Melendez-Diaz*—law enforcement had provided the sample "to a state laboratory required by law to assist in police investigations" and the report was sufficiently "formalized" (*id.* at 664-665 [internal quotation marks omitted]). Thus, as in *Melendez-Diaz,* the "certificate" concerning the testing results was "made for the purpose of establishing or proving some fact in a criminal proceeding" (*id.* at 663-664 [internal quotation marks omitted]).

The report was introduced into evidence through an analyst who did not perform or observe the gas chromatograph test on the defendant's blood sample. This "surrogate testimony," the Court concluded, did "not meet the constitutional requirement" (*id.* at 652). The Court rejected the characterization of the performing analyst as a "mere scrivener" of results "generated by the gas chromatograph machine" because the analyst's statements in the report "relat[ed] to past events and human actions not revealed in raw, machine-produced data" (*id.* at 659 [internal quotation marks omitted]). The testifying witness could not convey what "particular test and testing process" was employed, nor "expose any lapses or lies" on the testing analyst's part (*id.* at 661-662). Additionally, the testifying witness did not offer "any independent opinion concerning" the defendant's blood alcohol concentration (*id.* at 662 [internal quotation marks omitted]).

In a fractured opinion one year after *Bullcoming*, the Supreme Court held that an expert witness's testimony regarding a DNA profile developed from semen found on a rape victim's vaginal swabs did not violate the Confrontation Clause even though the witness did not perform the DNA testing or construct the DNA profile (*Williams v Illinois*, 567 US 50 [2012]). The plurality offered two bases for its holding. First, the plurality asserted that the DNA profile was not offered for the truth of the matter asserted and thus, was not a testimonial statement (*id.* at 57-58). Alternatively, the plurality determined that the DNA report was not testimonial because the report was created before a suspect was identified, the report's primary purpose was not to "obtain[ ] evidence to be used against petitioner" but to assist in "finding a rapist who was on the loose," and the DNA profile itself was not "inherently inculpatory" (*id.* at 58). Justice Thomas, in a concurrence, disagreed with both rationales of the plurality but would have held that the DNA report was not testimonial because it lacked "the solemnity of an affidavit or deposition" (*id.* at 111 [Thomas, J., concurring]). Therefore, while five Justices agreed that the DNA report was not testimonial, no rationale garnered a majority vote and *Williams* accordingly offers little guidance to our analysis (*see Marks v United States*, 430 US 188, 193 [1977]).

Other federal courts have considered the testimonial nature of autopsy reports (*see e.g. United States v Ignasiak*, 667 F3d 1217 [11th Cir 2012]; *Nardi v Pepe*, 662 F3d 107 [1st Cir 2011]; *United States v Williams*, 740 F Supp 2d 4 [DC Cir 2010]). Of particular relevance here is the Second Circuit's opinion in *Garlick v Lee* (1 F4th 122 [2d Cir 2021]). On a petition for writ of habeas corpus, the court rejected a First Department decision that

deemed an autopsy report non-testimonial in reliance on *Freycinet* and determined that the autopsy report was testimonial (*id.* at 134). In that case, "[t]he autopsy was performed in aid of an active police investigation" and "[t]he circumstances under which the autopsy report was created would lead any objective witness to 'believe that the [report] would be available for use at a later trial' " (*id.*, quoting *Crawford*, 541 US at 52). Further, the court deemed the report " '[a] solemn declaration or affirmation made for the purposes of establishing or proving some fact' " (*id.*, quoting *Crawford*, 541 US at 52). Applying "clearly established Supreme Court precedent," the Second Circuit rejected this Court's rationale in *Freycinet* (*id.* at 136).

We agree that *Freycinet*'s four-part framework for determining the testimonial nature of evidence does not survive *Melendez-Diaz* and *Bullcoming*. First, the Supreme Court in *Melendez-Diaz* made explicit that a statement need not be inherently inculpatory or "directly accuse" a defendant of wrongdoing to be considered testimonial (*Melendez-Diaz*, 557 US at 313). To the extent that the *Williams* plurality sought to establish such a litmus test for out-of-court statements, five Justices expressly rejected that approach (*see Williams*, 567 US at 114-117 [Thomas, J., concurring], 135-136 [Kagan, J., dissenting]). *Freycinet*'s consideration of "whether the contents of the report are a contemporaneous record of objective facts" also fails under Supreme Court scrutiny (11 NY3d at 42). That a forensic report records "near-contemporaneous observations" of the test or procedure does not shield it from the Confrontation Clause's protections (*Melendez-Diaz*, 557 US at 315).

Finally, the two factors of *Freycinet* that consider the witness's independence from law enforcement and their susceptibility to a "pro-law-enforcement bias" must similarly fall (*see Freycinet*, 11 NY3d at 41). The *Melendez-Diaz* Court specifically rejected the argument that statements "prone to distortion or manipulation" and those that are the "resul[t] of neutral, scientific testing" should be treated any differently for purposes of the Sixth Amendment (*id.* at 317-318). The reliability of an out-of-court statement has no effect on the testimonial nature of that statement, for the Confrontation Clause " 'commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination' " (*id.* at 317, quoting *Crawford*, 541 US at 61). The Supreme Court again rejected this argument in *Bullcoming* where the respondent asserted that the analyst's statements "were simply observations of an independent scientis[t] made according to a non-adversarial public duty" (*Bullcoming*, 564 US at 664 ["That argument fares no better here than it did in *Melendez-Diaz*"]). The performing analyst "must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa' " (*id.* at 661, quoting *Melendez-Diaz*, 557 US at 319-320 n 6).

We now hold that *Freycinet* should no longer be followed because it is inconsistent with the demands of the Confrontation Clause as articulated more recently by the Supreme Court.

B.

Turning now to the autopsy reports at issue here, we hold that the reports are testimonial under established Supreme Court precedent. The reports are "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact" (*Crawford*, 541 US at 52), namely the homicidal nature of these victims' deaths. Further, the reports contain indicia of formality that render them "solemn declaration[s] or affirmation[s]" (*Crawford*, 541 US at 52). Both reports, labeled with the formal title of "REPORT OF AUTOPSY," bear the official OCME seal. Both reports include a signed and dated certification that Dr. Hayes performed the autopsies. Specifically, the certification, as it pertains to the autopsy performed on the six-year-old victim, reads:

> "I hereby certify that I, John A. Hayes, M.D., City Medical Examiner – II, have performed an autopsy on the body of [the six-year-old victim] on the 26th day of October, 2012, commencing at 8:30 a.m., in the Manhattan Mortuary of the Office of Chief Medical Examiner of the City of New York. This autopsy was performed in the presence of Drs. Graham, Stahl-Herz and Vincent."

The certification for the two-year-old victim's autopsy is functionally identical. Finally, the results of each autopsy were formalized on an introductory page bearing the name of the performing examiner, the date on which the autopsies were conducted, and the "M.E. Case" number.

The reports were also created "under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial" (*id.*). The tragic condition of the bodies alone was indication enough to Dr. Hayes that these autopsy reports would have been available one day for use in a criminal

prosecution. Additionally, the autopsy reports do not merely state the location and size of wounds; instead, they repeatedly mention that the children were killed and that they were killed by defendant. The autopsy report of the six-year-old victim contained a "SUPPLEMENTAL CASE INFORMATION" page which provided that the deceased died "as a result of injuries caused by multiple stab wounds inflicted . . . by the nanny of the children." The autopsy report for the two-year-old victim also contained a "SUPPLEMENTAL CASE INFORMATION" page which stated that the victim died "as a result of injuries caused by three stab wounds inflicted to the neck of the decedent by the nanny of the children." Both reports acknowledged an open investigation and noted the name of the assigned New York Police Department detective. The reports further stated that, according to the assigned detective, "the exact circumstances of how or why the decedents were stabbed by the live-in nanny [were] unclear" at the time of the autopsies.

Moreover, OCME was required by law to deliver "all records pertaining to" these deaths to the New York County District Attorney's Office because there was an "indication of criminality" (NY City Charter § 557 [g]). Dr. Hayes, aware of his legal obligation to report his findings to the District Attorney, should have reasonably believed that these reports that he created could be used in a criminal prosecution. Because these autopsy reports are testimonial and defendant was not given the opportunity to cross-examine the performing medical examiner, the admission of the reports through an examiner who had not performed the autopsies and did not create these reports violated defendant's Sixth Amendment right of confrontation. While some autopsies conducted under different

circumstances may produce reports that do not rise to the level of testimoniality, that is simply not the case here.

C.

It is clear that "we may not disregard [the Confrontation Clause] at our convenience" (*Melendez-Diaz*, 557 US at 325), even where it has "the effect of allowing the guilty to go free" (*Davis v Washington*, 547 US 813, 833 [2006]).  It is also the case, however, that the Confrontation Clause does not entirely preclude the use of information contained in testimonial autopsy reports.  The Supreme Court suggested an "independent analysis" standard in *Bullcoming* (*see* 564 US at 662 ["Nor did the State assert that [the testifying analyst] had any 'independent opinion' concerning Bullcoming's BAC"]).

More recently, this Court in *People v John*, holding that a DNA report was testimonial, explicitly delineated the circumstances in which expert analysts could testify: "any analyst who witnessed, performed or supervised the generation of [a] defendant's DNA profile, or who used his or her independent analysis on the raw data" could testify in satisfaction of the Confrontation Clause (27 NY3d at 315).  Of course, autopsies and DNA testing are hardly neat forensic parallels.  DNA testing relies on computer-generated information whereas autopsies involve, almost exclusively, "the skill, methodology, and judgment of . . . highly trained examiners" without the aid of computer software (*Ignasiak*, 667 F3d at 1232).  DNA testing may be repeated until the sample has been expended.  Autopsies necessarily carry a certitude of finality.  Once a body has undergone an invasive

examination and been returned to loved ones, there is rarely an opportunity to do any confirmatory examination.

Though there are these critical differences between DNA testing and autopsies, we find it appropriate to look to *John* to inform the standard here.  Importing that approach, we hold that an expert medical examiner may offer conclusions as to the cause and manner of death, and surrounding circumstances, where that testifying expert performed, supervised, or observed the autopsy or used their independent analysis on the primary data (*see State v Navarette*, 294 P3d 435, 443, 2013-NMSC-003 [NM 2013].

Under New York's evidentiary rules, a testifying expert may rely on inadmissible hearsay material "if it is of a kind accepted in the profession as reliable in forming a professional opinion" (*People v Goldstein*, 6 NY3d 119, 124 [2005], quoting *People v Sugden*, 35 NY2d 453, 460 [1974]), so long as there is "evidence establishing the reliability of the out-of-court material" (*Hambsch v New York City Tr. Auth.*, 63 NY2d 723, 726 [1984]).  While our evidentiary rules would permit an expansive foundation for expert testimony from medical examiners, the more difficult question is which of these materials a testifying expert may rely upon to meet the demands of the Confrontation Clause. Autopsy files contain a variety of materials, such as autopsy reports, diagrams, photographs, dictation tapes, microscopic slides, crime scene evidence, and more, which are materials frequently relied upon by testifying medical examiners (*see Commonwealth v Reavis*, 465 Mass 875, 883, 992 NE2d 304, 311-312 [2013]; *see also Mahdavi v State*, 2020 OK CR 12, 478 P3d 449 [2020]; *Commonwealth v Brown*, 646 Pa 396, 185 A3d 316

[2018]; *State v Bass*, 224 NJ 285, 132 A3d 1207 [2016]; *State v Joseph*, 230 Ariz 296, 283 P3d 27 [2012]; *State v Kennedy*, 229 W Va 756, 735 SE2d 905 [2012]). Autopsy photographs and video recordings of a conducted autopsy may properly be relied upon by a testifying witness reaching their own independent conclusions. Further, standard anatomical measurements devoid of the subjective skill and judgment of the performing examiner constitute primary data upon which an expert may rely.

Here, we cannot be certain that any of Dr. Ely's conclusions were based on her independent review of primary data because such evidence was not elicited by the People. At times during her testimony, Dr. Ely appeared to be reading from the displayed diagrams or the autopsy reports themselves. Indeed, Dr. Ely provided details and language that was entirely identical to that in Dr. Hayes's reports.

At other times, however, Dr. Ely offered what appeared to be independent conclusions. Specifically, two pieces of Dr. Ely's testimony do not appear in the autopsy reports and thus, at first glance, seem to be her conclusions alone: that the six-year-old victim struggled against the attacker and that there was a reasonable possibility that the perpetrator stood behind the two-year-old victim when the major neck wound was inflicted. But the People failed to elicit testimony which would allow us to definitively say on which materials within the autopsy files Dr. Ely based these conclusions. Dr. Ely testified that the pattern of the wounds, the number of wounds, the placement of the wounds on the six-year-old victim's hands, and the "gaping" nature of certain wounds on the victim's torso led her to conclude that the victim was conscious and fighting against the attacker during

the incident. We are unable to discern whether Dr. Ely based this conclusion on Dr. Hayes's various conclusions, such as his characterizations of some stab wounds as "gaping" and the grouping and orientation of the varying wounds, or on an independent analysis of permissible primary data, such as the photographs' objective depiction of the wounds and their patterning. As to the second conclusion, Dr. Ely based her finding on the fact that the two-year-old's neck wound was deeper on one side than the other. Again, it is unclear from the record whether she impermissibly based this testimony on Dr. Hayes's conclusion that the stab wounds on the right side of the neck were superficial while the wound on the left side of the neck was "gaping" and "deeper" than the right side or on the primary data.

Nearly all of Dr. Ely's testimony was the type of "surrogate testimony" rejected by the Supreme Court in *Bullcoming* (*see* 564 US at 661) in that Dr. Ely simply "parrot[ed]" the autopsy reports (*see John*, 27 NY3d at 309). We do not suggest that agreement between the testifying expert and the performing examiner is itself impermissible. Rather, it is the People's obligation to establish that their testifying experts, who did not perform or observe the relevant autopsy, reached their conclusions themselves based upon a review of the proper materials rather than the conclusions of the performing examiner. Where the People fail to do so, we cannot be sure that a defendant's Sixth Amendment right has been safeguarded. As for the rest of Dr. Ely's testimony, we simply cannot tell whether it reflected her own deliberate, interpretative work product based on the primary data. We thus conclude that all of Dr. Ely's testimony was improper under the Sixth Amendment.

III.

Though defendant's constitutional right to confrontation was violated by the admission of the autopsy reports and Dr. Ely's testimony, that error was harmless beyond a reasonable doubt and does not mandate reversal (*see Crimmins*, 36 NY2d at 237). Under the harmless error standard, this Court must first consider whether the evidence of a defendant's guilt is overwhelming (*see People v Mairena*, 34 NY3d 473, 484 [2019]). If the proof was overwhelming, we must then consider whether " 'there is [a] reasonable possibility that the error might have contributed to defendant's conviction' " (*id.* at 485, quoting *Crimmins*, 36 NY2d at 237). Because defendant did not dispute that she caused the death of the victims but raised a defense of not guilty by reason of insanity, the harmless error analysis must be conducted accordingly (*see e.g. Goldstein*, 6 NY3d at 130; *People v Maher*, 89 NY2d 456, 462 [1997]; *see also Ortega*, 202 AD3d at 492 ["Nothing in the autopsy report had any bearing on defendant's defenses of insanity and lack of intent"]). Here, we agree with the Appellate Division that the evidence of defendant's guilt was overwhelming and the error in admitting the autopsy reports and allowing Dr. Ely's improper testimony did not contribute to defendant's conviction. Defendant argues that the testimony regarding the six-year-old victim's self-defense likely impacted the jury's view of the insanity defense. We disagree. The children's reactions to defendant's attack and whether they defended themselves are entirely unrelated to whether defendant "lacked substantial capacity to know or appreciate [t]he nature and consequences" of her actions

(*see* Penal Law § 40.15 [1]).  In sum, the autopsy reports and Dr. Ely's testimony had little to no bearing on defendant's insanity defense.

We have reviewed defendant's remaining contentions and conclude that they do not provide grounds for reversal.

Accordingly, the order of the Appellate Division should be affirmed.

Order affirmed. Opinion by Judge Singas. Chief Judge Wilson and Judges Rivera, Garcia, Cannataro, Troutman and Duffy concur. Judge Halligan took no part.

Decided November 20, 2023